## Miller's Estate.

Argued April 23, 1942. Before SCHAFFER, C. J.; MAXEY, DREW, LINN, STERN, PATTERSON and PARKER, JJ.

*Robert Grey Bushong,* for appellant.

*John D. Glase,* with him *Stevens & Lee,* for appellees.

OPINION BY MR. JUSTICE LINN, May 11, 1942:

Appellant complains of three surcharges imposed in the adjudication of his second and final account, filed

April 22, 1941, as executor of his father's estate. Testator died December 31, 1930; letters testamentary were granted January 14, 1931, and an inventory and appraisement showing assets of $18,975.84, was filed February 13, 1931. The estate is solvent and creditors are not involved. Testator left a widow who elected to take under the will; a son, the executor, who was given one-half the residue; a daughter to whom he bequeathed one dollar and for whose children he created a trust of the other half of the residue "until after the death of my daughter." A partial account had been the subject of adjudication in 1934.[1] The exceptant,[2] Annetta Reber, is the accountant's niece.

The account, the learned judge said, was not stated to "conform with law and established practice." Of the 31 exceptions filed, four were withdrawn; the others were considered and, as the account required substantial revision, it is apparent that the labors of the learned judge were rendered unnecessarily burdensome by the manner in which it had been stated; he made a number of readjustments and surcharges, of which the accountant does not now complain. His complaint is that he was surcharged: (1) $825. for failure to sell three shares of the First National Bank of Hamburg; (2) $2,200. for failure to sell eight shares of the Farmers Bank and

---

[1] Referring to that account, the learned judge said: "In that adjudication disposition was made of thirteen exceptions to the account, the widow's election to take under the will was noted, payment of the widow's exemption was decreed, payment of the legacy of $100 to Bethel Zion's Church at Grimville, and of $1. to Tamsen A. Reber, was decreed, and unconverted assets, scheduled on pages 8 and 9 of the adjudication, aggregating in appraised value $11,-679.50, were decreed to the accountant for liquidation and further accounting. A residue of $4,997.26 was distributed, one-half to Mahlon G. Miller, and one-half to Farmers Bank and Trust Company, of Kutztown, testamentary trustee for Werley B. Reber, William D. Reber and Annetta H. Reber, residuary legatees.

[2] After these exceptions were filed, the trustee for the daughter's children joined in the exceptions. The contest is between the accountant and his sister's children.

Trust Company of Kutztown; and (3) $540. for failure to sell twenty shares [3] of Lawrence Portland Cement Company stock.

We are impressed by the observation of the learned judge that "The estate was difficult of administration and fell on difficult times. The lapses of the executor were not gross. Errors were largely errors of judgment." We therefore note the general rule that a surcharge will not be imposed for mere errors of judgment. Surcharge is the penalty for failure to exercise common prudence, common skill and common caution in the performance of the fiduciary's duty and is imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care. Many cases [4] show that if the fiduciary exercise judgment in good faith, he will have done his duty. It was the duty of the executor diligently to liquidate the assets, pay the debts and prepare for distribution. He was not authorized to retain investments longer than reasonably necessary in the performance of duty and, on exceptions, had the burden of showing that he did what a prudent man, with such duties to perform, would have done in like circumstances. We have carefully studied the evidence and must conclude that accountant adequately sustained that burden.

The dominant factor affecting the administration of the three stocks in question was the general depression, the "difficult times" to which the learned judge referred. It is fair to say that in normal times, there would have been no difficulty at all in promptly selling these stocks at their appraisement; but we must deal with the situa-

---

[3] In the inventory only 10 shares were listed and appraised at $50. per share; the record shows that sometime in 1933, when the stock was quoted at a much lower price, another certificate for 10 shares was found in testator's Bible and thereafter carried in the account as though also appraised at $50.

[4] Among them, *Taylor's Estate*, 277 Pa. 518, 528, 121 A. 310; *Casani's Estate*, 342 Pa. 468, 471, 21 A.2d 59.

tion as it should have appeared to him at the time and not as we now know it to have developed.[5]

The bank stocks may be considered together because there is no controlling difference in the conditions. Testator had 8 shares in the Kutztown bank, a small country bank with a capital of $125,000. The stock was unlisted and was closely held in the vicinity. In accordance with a practice which is quite common in rural districts, the executor took the stock to the bank and, after consulting with its cashier, offered it for sale and left the certificate there with instructions to sell. The bank, as executor of an estate of one Sell, had in the preceding six months sold a block of 72 shares left by its testator. The cashier testified that "we told [accountant] if we could find a customer, we would let him know. But by that time the market had affected the people more or less locally, and it was very hard to dispose of them." He said: "The last share in the [Sell] estate was sold March 24, 1931, and the next one . . . was sold through foreclosure on collateral at a Philadelphia bank . . . October 28, 1931." He did not know the price. Five shares were sold November 4, "between two local people"; December 3, 1931, two shares between "two local people," but he did not know the price. On January 18, 1932, 13 shares "were transferred" at a sale of collateral. He was apparently testifying from the bank's transfer records and also referred to "family" transfers and distributions in kind. He was asked, on cross-examination, "could additional shares of stock have been sold between January 14, 1931, and July 14, 1931, if an effort had been made to sell those shares?" and replied, "A. That altogether depends; I think probably, if a man had good friends and could plead in the interests of the bank, that is the way we sold these shares in the Sell estate. He wouldn't likely sell many without any direct personal interest. Although we got rid of ours, it took six months

---

[5] *Casani's Estate*, 342 Pa. 468, 472, 21 A.2d 59; *Brown's Estate*, 287 Pa. 499, 503, 135 A. 112.

to dispose of seventy-two shares. Q. I am asking whether they could have been sold. A. They could have been sold, but at what price I do not know. Q. Do you think they could have been sold at the inventory price of $275? A. It depended upon who the salesman was, maybe. Q. Did you explain to Mr. Miller when he came to you that the bank does not make a practice of creating a market for its shares? A. Well, he brought the shares in and I told him we did not actively engage in selling, but I told him once in a while people came in and asked for bank shares and I told him if anybody came in we would offer his shares for sale."

But the accountant did considerably more than that. His counsel testified that for years prior to 1920 he "operated the Security and Realty Exchange" in Reading, which "dealt in local securities." He testified that he continued to keep himself advised with respect to bank stocks and securities. He was retained by the accountant in January, 1931, when the will was proved; until July, 1940, he had also been solicitor for the Kutztown Bank. He testified he went to the bank to see whether the bank would sell the stock and that he discussed the subject with Mr. Fister, the cashier, who told him there was no market at the time. The witness said he "looked for a market since that time" and had "been in touch with Mr. Fister."

With respect to the Hamburg Bank stock the accountant testified that he went to the bank in March, 1931, and saw the teller (not otherwise identified) and asked whether the bank could aid him in selling the stock. He said he did this on more than one occasion. He also discussed the sale of this stock with his counsel, referred to above, who testified that he "was very well acquainted with . . . George B. Miller [one of the bank's directors] and he came to my office almost every week, and he tried to help me sell them up around Hamburg and he didn't succeed in getting me a bid. I talked to others in Hamburg about them, that I thought would

buy on account of knowing people that were interested in that bank—Q. And you found no market? A. Found no market. They were putting up a big bank building and the double assessment people talked about and I simply couldn't get anywhere." About the difficulty of selling National Bank stocks in that community in 1931, he said: "As stated before I had a knowledge of bank stocks and securities, for years, locally, but, commencing in 1931, the bank situation locally became very bad. A suburban bank, within the six months' period after this man died, needed help. I am not going to mention the bank, but the boards undertook to try to save all local banks. We still thought prosperity was just around the corner, and all banks got together and lost their money, too. That was in 1931. In 1932 another bank called for the same aid, which was extended by all the banks, and that was lost, and in 1933 two more, and that was the whole field, and you could feel it wherever you would go, and it didn't even take a broker, it was just in the atmosphere, if you would refresh your minds."

The cashier of the Hamburg Bank testified the stock of the bank was closely held; there were 1,250 shares, but he thought there was always a market for them. He doubted that any shares changed hands in 1932; he knew of only two shares sold in 1931. He said the condition of the bank in 1931 "wasn't good." He knew the decedent owned three shares.

If, from the evidence to which we have referred and the rest in the record, it could be said that there was a thin market for the stocks of these banks, it must nevertheless be said that the evidence will not support the conclusion that the failure to find a purchaser for the shares resulted from neglect to exercise judgment in good faith. On the contrary, we think that it must be held that before the expiration of the six months after the accountant received letters testamentary there cannot be said to have been a market into which he could go and prudently dispose of these bank stocks: compare

*Quinn's Estate*, 342 Pa. 509, 513, 514, 516, 21 A.2d 78.

The testator had 20 shares[6] of Lawrence Portland Cement Company, also an unlisted stock. As in the case of the bank stocks, the accountant went to the office of the company in Northampton, in March, 1931, and consulted the secretary of the company with respect to its sale. The stock had then dropped to 40. A dividend of $1.00 a share was paid April 1, 1931. He asked the officers of the company to sell the stock for him and was told there was then no market. As in the case of the bank stocks he authorized his attorney, whose testimony shows the same familiarity with this as with the bank stocks, to obtain a purchaser. The manager of a broker's office in Reading testified that he "wouldn't call it an active stock," but that records showed that 250 shares were sold in the first six months of 1931, at prices from 44 to 53¼.

The evidence in the case will not support a surcharge merely because accountant did not make a sale of this stock soon after receiving letters testamentary or did not then offer the stock at public sale. The learned judge said: "We find nothing beyond a hope of improvement to warrant retention. Except in a most general sense, retention was not the result of the exercise of studied judgment." We have carefully considered the record and cannot concur in that inference from the evidence.

We think the accountant has established that in the administration of these three stocks he acted in good faith in the light of the ordinarily available sources of information and that the loss resulted from an honest exercise of judgment and cannot be said to have resulted from lack of common prudence, common skill and common caution.

The decree imposing the three surcharges is reversed; the record is remitted for modification accordingly; costs to be paid out of principal.

---

[6] When the second certificate for ten shares was found in 1933, the stock was quoted at less than the quotation at the time of the adjudication; there is no evidence that the accountant was negligent in not sooner learning of testator's ownership of these ten shares.