**In re ESTATE OF Clarence A. WARDEN, Deceased.**

**Appeal of Charles LeMenestrel & Genevieve LeMenestrel–Manas.**

Superior Court of Pennsylvania.

Argued Feb. 24, 2010.

Filed July 9, 2010.

Reargument Denied Sept. 13, 2010.

---

Louis J. Sinatra, Philadelphia, for appellants.

Thomas S. Biemer, Philadelphia, for Wachovia Bank, Participating Party.

Gary R. Battistoni, Philadelphia, for Warden, Participating Party.

BEFORE: BOWES, OTT, and FITZGERALD *, JJ.

OPINION BY FITZGERALD, J.:

¶ 1 Appellants, Charles LeMenestrel and Genevieve LeMenestrel–Manas ("Appellants"), appeal from the order entered in the Court of Common Pleas of Delaware County, which overruled their objections to the accounting and denied their claim for imposition of a surcharge on the Trus-

tees, William G. Warden III ("Warden III") and Wachovia Bank, N.A. ("Wachovia") (collectively, "Trustees"). We hold that under these facts, Trustees acted in good faith and did not engage in intentionally dishonest behavior. Finally, we hold that under the facts of this case, acquiescence and laches bars Appellants' claims. Accordingly, we affirm.

¶ 2 The trial court set forth the background:

The Clarence A. Warden Residuary Trust ("Trust") was created by Charles A. Warden, Sr. ("Settlor"), the grandfather of the Co–Trustee, William G. Warden, III . . . and the great-grandfather of the Objectants, Charles and Genevieve LeMenestrel–Manas, who are brother and sister.

*     *     *

At the time of the Settlor's death in 1951 . . . 109, 960 shares of stock of the Superior Tube Company (hereinafter "Superior Tube")[,] a company co-founded in 1931 by the Settlor[,] [was transferred to the Trust]. In 1970, Superior Tube's shares of stock were exchanged for those in a holding company known as CAWSL Corporation (hereinafter "CAWSL") in which Superior Tube became one of a number of subsidiaries thereof. In 1996, CAWSL's name was changed to Superior Group, Inc., hereinafter referred to as "SGI". The Trust was, from its inception and at the Settlor's intention, heavily concentrated with SGI stock, valued initially at $1,511,950.00 pursuant to the court approved Final Estate Accounting filed in 1958, and in the First and Second Accountings filed in 1982 and 1987, all court approved without objection from any beneficiary.

* Former Justice specially assigned to the Superior Court.

The retention and investment of Trust property was designated a discretionary act by the Settlor, who expressly provided that his Trustees would have no liability for the exercise thereof, so long as they acted in good faith:

> "The exercise of good faith by the Trustees under this instrument of any and all of the foregoing powers, authority and discretion shall be without any responsibility or liability upon them for any depreciation or other loss by reason of so doing."

In amplification of the discretion granted to the Trustees regarding their investment decisions, Warden Sr. expressed a preference for focusing on an investment's long-term performance and his own investment philosophy:

> "I suggest to my Trustees that in the investment and reinvestment of funds from time to time in their possession they favor the purchase of common stock equities in companies which to them appear to have or to indicate the promise of growth and thus tend to off-set the decrease of purchasing power over the years. I also give my Trustees full power to purchase and retain all investments which at the time of purchase or receipt may be producing little or no return, and also to purchase and retain any other securities, the return on which may at any time be reduced or wholly eliminated. In so suggesting I do not intend to restrict them in their full freedom, except as otherwise provided herein, in making other types of investments or in making investments having a fixed return, but merely to suggest a broad program of investment which would be in substance a continuation of that policy which in my lifetime I have consistently followed."

*     *     *

The Settlor placed a number of specific restrictions on the power of the Trustees to sell the SGI shares of stock. The Codicil provides:

> "THIRD: If at the time of my death, I am owner of stock of the SUPERIOR TUBE COMPANY, or of the stock of any corporation with which the said Company has merged or consolidated, the general power of sale given to my Executors and Trustees in my Will with respect to any property of mine shall be subject, as respects such stock alone, to the limitations of the Codicil set forth.["]

> "I direct that said stock shall not be sold by my Executors or Trustees, either in whole or in part, unless (a) all of my Executors or Trustees, as the case may be, at the time in office, agree to the same, and (b) in addition unless all of the Trustees of any other then subsisting Trust created by me and holding any part of said stock, agree in writing to such sale by the Executors or Trustees under my Will, and (c) finally unless such sale or sales are at a price not less than that determined by Edward Hopkinson, Jr. ... as representing the fair market value therefore.... In the event that Edward Hopkinson, Jr. is dead or refuses or is unable to make such valuation, then I direct that any such sale or sales by my Executors or Trustees, with the written approval as aforesaid of the Trustees of any other then subsisting Trust created by me and holding any of such stock, shall be (a) at a price or prices not less than the book value thereof as determined by sound and customary accounting procedure...."

Trial Ct. Op. at 4–7 (citations and footnotes omitted); *see generally Lemenestrel v. Warden,* 964 A.2d 902 (Pa.Super.2008),

*appeal denied,* 603 Pa. 695, 983 A.2d 729 (2009).

¶ 3 In 1987, Warden III successfully petitioned the trial court to become the successor Trustee to his father. Trial Ct. Op. at 7. All present and future beneficiaries consented to this appointment. *Id.* at 8. Warden III is also an income beneficiary of the Trust with a twenty-five percent interest. *Id.* at 10. Appellants, on the other hand, "hold a combined 12.5 percent interest in the Trust. The remaining vested beneficiaries [including Warden III,] collectively holding an 87.5 percent interest in the Trust, have registered no objections to the September 29, 2004 Accounting at issue here." *Id.* at 11. The accounting period at issue was from January 1, 1987, through July 30, 2004. Appellants' interest vested in the year 2000. *Id.* at 10.

¶ 4 The trial court provides a detailed history of SGI from its founding in 1931 to the present that we do not recount here. *See id.* at 11–28. SGI's value has fluctuated throughout the company's life, which affects the Trust's performance. "[D]uring [Wachovia's] administration of this Trust, the Trust's principal income in SGI has increased from $1.5 Million at the time of its inception to at least $189 Million[.]" *Id.* at 67.

SGI held its first ever formal shareholders' meeting on June 9, 2001, which gathering was attended by Warden III ... and other family shareholders, including [Appellants]. The meetings, like other such yearly gatherings to follow were driven by a two part agenda, a short first portion thereof that included the Bank Trust officers, and a second longer meeting attended by the family shareholders in SGI. During the second part of each of these meetings, written materials, including copies of slides depicting operating income and revenue for a number of the subsidiaries, were shown to and reviewed with the family during presentations by ... Warden III ....

It was not until the 2003 and 2004 family meetings in which a plan to fully liquidate SGI for certain business reasons related in slide materials and to develop a "family trust office" or "Private Trust Company" ("PTC") that [Appellants] began to become uncomfortable with the direction of the company. Although initially enthused about the PTC, [Appellants] reported concerns developing during the Summer of 2003, regarding potential tax consequences of the PTC and fears of an "undemocratic" governing structure of that organization ....

During the Family Meeting held in February 2004, the family members were provided with information evincing that SGI's financial structure and performance were "poor and disappointing". The assemblage was advised of an SGI operating loss totaling over $66 Million sustained from 2000 through 2003, and that the result would be a reduction of their dividend payments by half. [Appellants] declared that their reaction to the foregoing information as well as a suggestion that a separate trust be maintained for them *sans* their SGI stock led them to research the Company on the internet ....

*Id.* at 36–38 (citations omitted). An accounting was filed; Appellants filed objections. A sixteen-day trifurcated trial ensued.

¶ 5 On February 26, 2009, the trial court overruled Appellants' objections and denied Appellants' claim for a surcharge. On April 1, 2009, the trial court entered a final adjudication, and Appellants timely appealed on April 14, 2009.

¶ 6 Appellants raise the following issues:

Whether the trustees acted in good faith and properly discharged their fiduciary duties in monitoring and retaining the SGI stock?

Whether the bank was powerless to divest SGI, although the bank collaborated with Warden III so that he could become co-trustee of the trust, thus creating an impasse?

Whether there was a loss to the trust established in the trifurcated trial, which deferred the issue of loss to a subsequent trial?

Whether Appellants acquiesced to the monitoring and retention of the SGI stock in the trust and were guilty of laches?

Appellants' Brief at 2.

■ ¶ 7 The standard for reviewing an Orphan's Court findings is deferential. *In re Estate of Harrison,* 745 A.2d 676, 678 (Pa.Super.2000).

> The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony. In reviewing the Orphans' Court's findings, our task is to ensure that the record is free from legal error and to determine if the Orphans' Court's findings are supported by competent and adequate evidence and are not predicated upon capricious disbelief of competent and credible evidence.

*In re Estate of Cherwinski,* 856 A.2d 165, 167 (Pa.Super.2004) (quoting *In re Estate of Schultheis,* 747 A.2d 918, 922 (Pa.Super.2000)).

> When the trial court has come to a conclusion through the exercise of its discretion, the party complaining on appeal has a heavy burden. It is not sufficient to persuade the appellate court that it might have reached a different conclusion if, in the first place, charged with the duty imposed on the court below; it is necessary to go further and show an abuse of the discretionary power. An abuse of discretion is not merely an error of judgment, but if in reaching a conclusion the law is overridden or misapplied, or the judgment exercised is manifestly unreasonable, or the result of partiality, prejudice, bias or ill-will, as shown by the evidence of record, discretion is abused. A conclusion or judgment constitutes an abuse of discretion if it is so lacking in support as to be clearly erroneous.... If the lack of evidentiary support is apparent, reviewing tribunals have the power to draw their own inferences and make their own deductions from facts and conclusions of law. Nevertheless, we will not lightly find reversible error and will reverse an orphans' court decree only if the orphans' court applied an incorrect rule of law or reached its decision on the basis of factual conclusions unsupported by the record.

*In re Scheidmantel,* 868 A.2d 464, 479 (Pa.Super.2005) (*"Scheidmantel"*) (citations, alterations, and quotation marks omitted); *accord In re Deed of Trust of Rose Hill Cemetery Ass'n Dated Jan. 14, 1960,* 527 Pa. 211, 216, 590 A.2d 1, 3 (1991) (finding an abuse of discretion where the court specifically denied what the law allowed); *In re Estate of Banes,* 452 Pa. 388, 394–95, 305 A.2d 723, 727 (1973) (finding that the court abused its discretion where the facts did not justify a departure from the will's express terms).

¶ 8 Appellants argue that Trustees acted in bad faith by abdicating their responsibilities and by failing to act, to exercise actual and honest judgment, to disclose, and to balance beneficiaries' interests with their own. Relying on *Scheidmantel*, Appellants contend that a higher standard of care applies to corporate trustees such as Wachovia, and the trial court failed to apply that higher standard of care. *See* Appellant's Brief at 16–17. Further, Appellants claim that Wachovia improperly refused to divest SGI stock for numerous reasons, including, but not limited to: failures to follow Wachovia policies, to review SGI's financial statements, to meet regularly with Warden III, and to inform trust beneficiaries. Finally, Appellants assert that the trial court failed, *inter alia*, to consider Warden III's individual liability. We disagree.

■ ¶ 9 "A trust is a fiduciary relationship with respect to property, subjecting the person by whom the title to the property is held to equitable duties to deal with the property for the benefit of another person...." *In re Trust of Hirt*, 832 A.2d 438, 447–48 (Pa.Super.2003) (citing Restatement (Second) of Trusts, § 2). The settled law in Pennsylvania is that "the pole star in every trust ... is the settlor's ... intent and that intent must prevail." *Estate of Pew*, 440 Pa.Super. 195, 655 A.2d 521, 533 (1994) ("*Pew*")

(quoting *In re Trust Estate of Pew*, 411 Pa. 96, 106, 191 A.2d 399, 405 (1963)). The settlor's intent may be divined by considering the trust document as a whole. *Farmers Trust Co. v. Bashore*, 498 Pa. 146, 150, 445 A.2d 492, 494 (1982) ("A settlor's intent is to be determined from all the language within the four corners of the trust instrument, the scheme of distribution and the circumstances surrounding the execution of the instrument. Only if a settlor's intent cannot be ascertained with reasonable certainty will a court apply canons of construction, to attribute a reasonable intention to the settlor in the circumstances."); *In re Walton's Estate*, 409 Pa. 225, 231, 186 A.2d 32, 36 (1962) (stating that the testator's intentions "must be ascertained from the language and scheme of his [entire] will [together with the surrounding facts and circumstances]" (alteration in the original)).

■ ¶ 10 The trust's specific provisions govern the trust's operation. 20 Pa.C.S. § 7705(a) ("Except as provided in subsection (b) [listing certain mandatory rules], the provisions of a trust instrument prevail over any contrary provisions of [Pennsylvania law]."); *In re Estate of Niessen*, 489 Pa. 135, 139, 413 A.2d 1050, 1052 (1980) ("The nature and extent of the duties of a corporate trustee are primarily to be ascertained from the trust instrument.").[1] The Decedents, Estates and Fiduciaries

---

1. The comment to 20 Pa.C.S. § 7705(a) is illustrative:

   While this Code provides numerous procedural rules on which a settlor may wish to rely, the settlor is generally free to override these rules and to prescribe the conditions under which the trust is to be administered. With only limited exceptions, the duties and powers of a trustee, relations among trustees, and the rights and interests of a beneficiary are as specified in the terms of the trust.

   *Id.* Because Pennsylvania's codification of the Uniform Trust Code in 2006 generally

reflects well-settled Pennsylvania caselaw, we rely upon such caselaw where applicable. 20 Pa.C.S. § 7706; *see generally In re Estate of Stephano*, 602 Pa. 527, 536, 981 A.2d 138, 143 (2009) (noting "the primary purpose of adopting the UTC was to clarify the law surrounding trusts, and to make Pennsylvania probate law more uniform with our sister states, while simultaneously preserving our vast body of common law precedent...." (Baer, J., concurring)). *Cf. Commonwealth v. Aikens*, 990 A.2d 1181, 1185 n. 2 (Pa.Super.2010) (relying on cases predating adoption of Pennsylvania Rules of Evidence).

Code permits the testator to define the duties of a fiduciary:

### § 7319. Directions of testator or settlor

**(a) General Rule.**—The testator or settlor in the instrument establishing a trust may prescribe the powers, **duties and liabilities of the fiduciary** regarding the investment or noninvestment of principal and income and the acquisition, by purchase or otherwise, retention, and disposition, by sale or otherwise, of any property which, at any time or by reason of any circumstance, shall come into his control.

20 Pa.C.S. § 7319(a) (emphasis added); *In re Mulert's Estate*, 360 Pa. 356, 359, 61 A.2d 841, 842 (1948). Thus, "where a trust instrument is explicit as to the duty owed, it, as evidencing the settlor's ... intent, should govern." *In re Estate of Niessen*, 489 Pa. at 139, 413 A.2d at 1052.

■■■ ¶ 11 "The primary duty of a trustee is the preservation of the assets of the trust and the safety of the trust principal." *Pew*, 655 A.2d at 542. "The standard of care imposed upon a trustee is that which a man of ordinary prudence would practice in the care of his own estate." *Id.* at 541. Surcharge is the remedy when a trustee fails "to exercise common prudence, skill and caution in the performance of its fiduciary duty, resulting in a want of due care." *Id.; see In re Miller's Estate*, 345 Pa. 91, 93, 26 A.2d 320, 321 (1942) (defining "surcharge" as "the penalty for failure to exercise common prudence, common skill and common caution in the performance of the fiduciary's duty ... imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care").

■■ ¶ 12 The court must find the following before ordering a surcharge: (1) that the trustee breached a fiduciary duty and (2) that the trustee's breach caused a loss to the trust. *Pew*, 655 A.2d at 542; *see also In re Miller's Estate*, 345 Pa. at 93, 26 A.2d at 321.[2] Where there is no breach of fiduciary duty, there is no basis for a surcharge. *In re Estate of Cooperman*, 487 Pa. 148, 151, 409 A.2d 8, 10 (1979) (*per curiam*); *In re Bard's Estate*, 339 Pa. 433, 437, 13 A.2d 711, 713 (1940); *see Estate of Stetson*, 463 Pa. 64, 78, 345 A.2d 679, 687 (1975) (holding no breach of fiduciary duty where there is no market to sell an investment causing a loss to the trust). Even if there is a breach of duty, however, where there is no loss, there is no basis for a surcharge. *In re Mendenhall*, 484 Pa. 77, 82 n. 3, 398 A.2d 951, 954 n. 3 (1979) (citing Restatement (Second) of Trusts §§ 174, 176, 227, 228, 230, and 231 (1959) and further stating "A trustee cannot be surcharged for a breach of ... duty unless the breach caused a loss.").

¶ 13 Good faith exists when something is "done honestly, **whether it be done negligently or not.**" *Robinson Protective Alarm Co. v. Bolger & Picker*, 512 Pa. 116, 124, 516 A.2d 299, 304 (1986) (quoting the Uniform Fiduciaries Act, 7 P.S. § 6351(2)); *see Hartman v. Baker*, 766 A.2d 347, 354 n. 3 (Pa.Super.2000) (defining "good faith" as "[a] state of mind consisting in (1) honesty in belief or purpose, (2) faithfulness to one's duty or obligation, (3) observance of reasonable commercial standards of fair dealing in a given trade or business, or (4) absence of intent to defraud or to seek unconscionable advantage" (quoting Black's Law Dictionary 701 (7th ed. 1999))).

**2.** The issue of whether a surcharge may be imposed where there is an overall gain to the trust is not properly before us.

¶ 14 Mere negligence will not negate good faith. *Robinson Protective Alarm Co.,* 512 Pa. at 124, 516 A.2d at 304. However,

> [a]t what point does negligence cease and bad faith begin? The distinction between them is that bad faith, or dishonesty, is, unlike negligence, wilful. The mere failure to make inquiry, even though there be suspicious circumstances, does not constitute bad faith, unless such failure is due to the deliberate desire to evade knowledge because of a belief or fear that inquiry would disclose a vice or defect in the transaction, [ ] that is to say, where there is an intentional closing of the eyes or stopping of the ears.

*Davis v. Pennsylvania Co. for Ins. on Lives and Granting Annuities,* 337 Pa. 456, 460, 12 A.2d 66, 69 (1940) (citation omitted). In the context of an express good faith clause, bad faith "is not simply bad judgment or negligence, but rather it implies the conscious doing of a wrong because of dishonest purpose or moral obliquity." *U.S. Fid. & Guar. Co. v. Feibus,* 15 F.Supp.2d 579, 585 (M.D.Pa.1998) (applying Pennsylvania's definition of "bad faith" in granting summary judgment to surety who made payments in good faith pursuant to a good faith clause contained in an indemnity agreement). The Pennsylvania Supreme Court has defined bad faith conduct as being motivated by "fraud, dishonesty, or corruption." *Petition of McNair,* 324 Pa. 48, 63, 187 A. 498, 505 (1936); *see Scheidmantel,* 868 A.2d at 482 (stating that bad faith occurs when "the trustee … acts dishonestly, or with an improper even though not a dishonest motive, or fails to use his judgment, or acts beyond the bounds of reasonable judgment" (citations and quotation marks omitted)).

¶ 15 The law also provides for a higher standard of care under limited circumstances. *Scheidmantel,* 868 A.2d at 482. "When a corporate trustee holds itself out as possessing greater knowledge and skill than the average man, it places itself 'under a duty to exercise a skill greater than that of an ordinary man and the manner in which investments were handled must accordingly be evaluated in light of such superior skill.'" *Id.* (quoting *In re Estate of Killey,* 457 Pa. 474, 477–78, 326 A.2d 372, 375 (1974)). This standard, however, applies only where the trust instrument does not explicitly state a standard of care. *Id.* at 483, 326 A.2d 372 ("[I]f an instrument is explicit as to the duty owed by the trustee, those terms should govern because '[t]he nature and extent of the duties of a corporate trustee are primarily to be ascertained from the trust instrument.'" (quoting Restatement (Second) of Trusts, § 164 (1959))). The *Scheidmantel* Court found that the trust instrument explicitly stated a standard of care: "No Trustee shall be liable for acts or omissions in administering the trust estate or any trust created by this Agreement, except for that Trustee's own **actual fraud, gross negligence or willful misconduct.**" *Id.* The *Scheidmantel* Court therefore evaluated the corporate trustee under those standards rather than under a heightened standard of care. *Id.* at 484–88. Thus, the heightened standard of care for corporate trustees applies only when the trust instrument does not explicitly mandate a standard of care. *See id.*

¶ 16 Instantly, paragraph five of the Trust states that "[t]he exercise in **good faith** by the Trustees under this instrument of any and all of the foregoing powers, authority and discretion shall be without responsibility or liability upon them for any depreciation or other loss by reason of doing so." Pet. of Trustees for Adjudication of Third Account, 9/29/04; R. at 102a

(emphasis added). Because Settlor specifically indicated a good faith standard of care, this standard binds all trustees, including Warden III and Wachovia. *See In re Estate of Niessen*, 489 Pa. at 140, 413 A.2d at 1053 (finding that a good-faith standard applied where the trust instrument specifically stated, "Neither of my executors or trustees shall have any liability for any mistake or error of judgment made in good faith"); *Estate of McCredy*, 323 Pa.Super. 268, 470 A.2d 585, 594 (1983) ("**Except as otherwise provided by the terms of the trust** ... if the trustee has special skills or is named trustee on the basis of representations of special skills or expertise, he is under a duty to use those skills." (quoting Uniform Probate Code § 7–302) (emphasis added)). Trustees therefore breach their fiduciary duty only if they do not act in good faith. *See In re Estate of Niessen*, 489 Pa. at 140, 413 A.2d at 1053.

■■■ ¶ 17 In order to succeed, Appellants must show the trial court ignored evidence of record establishing that Trustees intentionally acted with a dishonest state of mind. *See Davis*, 337 Pa. at 460, 12 A.2d at 68. Appellants reference many instances in the voluminous record as evidence of such alleged bad faith, such as Wachovia's failures to follow policy, to attend SGI board meetings, to review SGI financial statements, and to meet with Warden III.[3] Appellants, however, refer us to no caselaw holding that any of these alleged acts or omissions rise to the level of intentionally dishonest behavior. *See id.; Scheidmantel*, 868 A.2d at 482. Regardless, after a review of the exhaustive record, the trial court's determination that Trustees acted in good faith is "supported by competent and adequate evidence," and

thus we discern no basis for Trustees' liability for holding Trust assets in accordance with Settlor's wishes. *See In re Estate of Cherwinski*, 856 A.2d at 167. Appellants did not establish the trial court abused its discretion. *See id.*

■■■ ¶ 18 Next, Appellants argue that the trust instrument's language did not prevent Trustees from selling SGI stock. *See* Trial Ct. Op. at 5–7 (quoting the language in question). Appellants claim this language requires a "broad program of investment" in "marketable securities," as opposed to retention of SGI stock. Furthermore, Appellants argue that the Trust's language required that Trustees sell SGI stock. Therefore, Trustees' failure to either consider divesting or actually divest the Trust of its SGI holdings was not justified. In advancing this contention, Appellants implicitly argue that Wachovia breached its duty of care by not compelling Warden III to sell SGI stock. Appellants are not entitled to relief.

¶ 19 As previously stated, the trust's provisions govern the trust's operation. 20 Pa.C.S. § 7705(a). In the instant Trust, three provisions apply. First, Settlor specifically restricted the sale of trust assets:

I direct that said stock **shall not be sold** by my Executors or Trustees, either in whole or in part, **unless** (a) **all** of my Executors or Trustees, as the case may be, at the time in office, agree to the same, and (b) in addition unless all of the Trustees of any other then subsisting Trust created by me and holding any part of said stock, agree in writing to such sale by the Executors or Trustees under my Will, **and** (c) finally unless such sale or sales are at a price not less than ... the fair value therefor [or] not

---

**3.** Appellants essentially suggest that this Court reweigh the evidence and conclude Trustees breached their fiduciary duty. Such

a suggestion, however, is not our standard of review.

less than the book value thereof as determined by sound and customary accounting procedure.... .

Pet. of Trustees for Adjudication of Third Account, 9/29/04; R. 105a–06a (emphases added). There are two prerequisites to any sale of SGI stock: (1) **all** trustees must agree to the sale; and (2) the sale must be for at least book value. Thus, the Trust bars unilateral action by one trustee when there are multiple trustees. *Id.* Indeed, Settlor provided no mechanism for breaking ties; in the event that one trustee wants to sell and the other does not, the sale cannot occur because the trustees do not agree. *See In re Hartje's Estate,* 345 Pa. 570, 574, 28 A.2d 908, 910 (1942) (quoting Restatement of Trusts, § 186, for the rule that a trustee can exercise only such powers as are conferred upon him by the trust document); *Delaware Valley Factors, Inc. v. Ronca,* 442 Pa.Super. 609, 660 A.2d 623, 625 (1995) (same). Even assuming Wachovia wanted to sell SGI stock, Wachovia would be powerless to act without Warden III's consent. *See* Pet. of Trustees for Adjudication of Third Account, 9/29/04; R. 105a–06a. Furthermore, Wachovia is not required to act to break the tie.

¶ 20 Second, Settlor specifically provided a proposed investment strategy:

> I **suggest** to my Trustees that in the investment and reinvestment of funds from time to time in their possession they favor the purchase of common stock equities in companies which to them appear to have or to indicate the promise of growth and thus tend to offset the decrease of purchasing power over the years.... **In so suggesting I do not intend to restrict them in their full freedom,** except as otherwise provided herein, in making other types of investments or in making investments having a fixed return, **but merely to suggest a broad program of investment which would be in substance a continuation of that policy which in my lifetime I have consistently followed.**

Pet. of Trustees for Adjudication of Third Account, 9/29/04; R. 101a (emphases added). The plain language contradicts Appellants' argument that the Trust **mandated** a broad investment strategy. *See id.* Settlor states that his suggestions do not restrict the Trustees' "full freedom" except as otherwise provided. *Id.* Because Trustees were not required to follow Settlor's suggested investment strategy, Trustees were not required to sell SGI stock.

¶ 21 Third, Settlor affirmatively granted Trustees the power to hold investments notwithstanding the return, or lack thereof. Pet. of Trustees for Adjudication of Third Account, 9/29/04; R. 101a ("I also give my Trustees full power to purchase and retain investments which at the time of purchase or receipt may be producing little or no return, and also to purchase and retain any other securities, the return on which may at any time be reduced or wholly eliminated."). Under the terms of the Trust, Trustees could retain the SGI stock for as long as they saw fit, even if the returns declined or were nonexistent. *See Farmers Trust Co.,* 498 Pa. at 150, 445 A.2d at 494 (applying default law only where the settlor failed to state his intent); *Pew,* 655 A.2d at 533 (stating that the settlor's intent as divined from the four corners of the trust instrument is the pole star). The Trust's language therefore granted Trustees broad discretion, requiring only that all Trustees agree prior to selling any investments and that any sale of SGI stock occur for at least book value.

¶ 22 Appellants rely on *In re Estate of Scharlach,* 809 A.2d 376 (Pa.Super.2002) ("*Scharlach*"), in arguing that Wachovia should have either obtained Warden III's

consent to sell the SGI stock or sought court-ordered relief.[4] In *Scharlach*, this Court held that the trustee breached its fiduciary duty by not following an investment plan specifically designed to meet the beneficiary's lifetime needs. *Id.* at 384. Instantly, unlike *Scharlach*, Settlor did not establish a specific investment plan that Trustees ignored. *See also Pitts v. First Union Nat'l Bank*, 262 F.Supp.2d 593, 597 n. 3 (D.Md.2003) (applying Pennsylvania law and distinguishing *Scharlach*: "In the instant case, neither party has identified a specific investment plan for the Trust that was ignored by either Defendant or its predecessors."). Settlor suggested, but did not require, that Trustees follow the same investment strategy Settlor followed during his life. For these reasons, the trial court did not err in concluding Wachovia did not breach any fiduciary duties by declining to force Warden III to sell SGI stock. *See In re Estate of Cherwinski*, 856 A.2d at 167.

¶ 23 Appellants next argue that the court erred by ignoring *Scheidmantel* and *Scharlach* and relying on "old law." Appellants further contend that the *Pew* holding, that trust-asset loss be measured over the entire period of investment, does not apply. In sum, Appellants contend the court erred by finding that there was no loss to the Trust. We disagree.

¶ 24 In a surcharge action, the propriety of a trustee's investment is judged as it appeared **at the time of investment** and not in light of subsequent changes. *Pew*, 655 A.2d at 543. "Hindsight is not the test of liability for surcharge." *Id.* at 544. Investments are viewed based on their long-term, rather than short-term, performance. *Id.* No loss occurs where a trust asset increases in value over the entire period of investment. *Id.* (holding that, where a trust asset increased five-fold in value during the course of the trust's administration, appellants failed to establish "that the trustees' breach of duty caused a loss to the trust"); *see also In re Francis Edward McGillick Foundation*, 537 Pa. 194, 203, 642 A.2d 467, 471–72 (1994) (holding that no basis for surcharge existed where a foundation's assets increased in value from $873,000 to $3,500,000 over seventeen years). Thus, a trust asset may fluctuate in value throughout the trust's life without resulting in a loss.

¶ 25 Contrary to Appellants' assertions, neither *Scheidmantel* nor *Scharlach* dispensed with the *Pew* holding. In *Scharlach*, the trustee argued that no loss occurs where the principal remains intact. *Scharlach*, 809 A.2d at 386. This Court, however, held that the trustee breached a fiduciary duty by failing to consider the beneficiary's needs. *Id.* at 384. Specifically, the trustee failed to implement an investment plan specifically designed to meet the beneficiary's needs. *Id.* at 386. Thus, the *Scharlach* Court concluded: "Absent [the trustee's] breach of its duty, the successor guardian of the estate would now have in its possession assets valued substantially in excess of those received. A surcharge is permitted when a fiduciary fails to exercise due care, and loss is incurred." *Id.* A similar situation occurred in *Scheidmantel*: this Court held the trustee breached a fiduciary duty, resulting in a loss to the trust. *Scheidmantel*, 868

4. Appellants also rely on *In re Trust Estate of Rosenfeld*, No. 1664 IV of 2002, 2006 WL 3040020, 2006 Phila. Ct. Com. Pl. LEXIS 394 (C.P. Philadelphia July 31, 2006), *aff'd in part and rev'd in part*, 953 A.2d 849 (Pa.Super.2008). It is well-settled that decisions of the Courts of Common Pleas are not binding on the Superior Court. *Jamison v. Concepts Plus, Inc.*, 380 Pa.Super. 431, 552 A.2d 265, 267 (1988). Regardless, a panel of this Court reversed in part *In re Trust Estate of Rosenfeld* in an unpublished memorandum decision.

A.2d at 490, 492. Thus, because we discern no error in the trial court's determination that the instant Trustees did not breach a fiduciary duty, *Scheidmantel* and *Scharlach* do not apply.

¶ 26 Further, *Pew* is directly analogous to this case. In *Pew,* the trust assets were long-term investments in public stock that declined in value during the disputed accounting period. *Pew,* 655 A.2d at 542–43. Between 1932 and 1989, the trust assets increased in value from $816,140.00 to $7,503,114.86. *Id.* at 524, 528. Between 1989 and 1992, the trust assets declined in value to $4,362,117.54. *Id.* at 530.

¶ 27 The *Pew* appellants argued that courts should disregard long-term performance and focus instead on short-term performance during a narrow time span with any decline in that span considered a "loss." *Id.* at 544. The *Pew* Court, however, rejected that argument:

> [I]t would be manifestly unfair of this Court to permit trust beneficiaries, armed with the twenty-twenty laser-like vision of hindsight, to focus in upon any short term time period during the course of the trust's administration when the price of the stocks forming the trust principal had declined as a basis for subjecting the trustees to a surcharge for failing to sell the stocks, when the overall long-term performance of the same stocks led to a five-fold growth in the value of the trust principal.

*Id.* The *Pew* Court held the trustees succeeded in their primary duty to protect and preserve the trust assets because the trust assets had increased nine-fold in value, from $816,140.00 to $7,503,114.86, over the trust's sixty-year life under the trustees' management. *Id.* at 542–43. Although the trust assets had incurred a loss over a narrow time span, the *Pew* Court declined to find the trustees breached their fiduciary duty because the focus is on long-term performance. *Id.* at 544.

¶ 28 Instantly, the Trust assets have increased in value from $1.5 million in 1951 to $189 million at the commencement of this action. *See* Wachovia's Trial Ex. 679; R. at 8777a. Appellant's "laser-like" focus on an alleged loss of $300 million between the 1990s and 2003 is contrary to *Pew. See Pew,* 655 A.2d at 544. As in *Pew,* the instant trust assets increased in value over the entire period of investment, specifically from $1.5 million to $189 million. *See id.;* Wachovia's Trial Ex. 679; R. at 8777a. Thus, we observe that even if Trustees breached their duty, no surcharge could be imposed because there was no loss. *See Pew,* 655 A.2d at 544. We therefore discern no abuse of discretion or error of law by the trial court. *See In re Estate of Cherwinski,* 856 A.2d at 167.

¶ 29 Finally, Appellants claim the trial court erred by concluding the doctrines of acquiescence and laches barred their claims. Based on this Court's holdings in *Hansel v. Hansel,* 300 Pa.Super. 548, 446 A.2d 1294, 1299 (1982), Appellants argue that laches does not currently apply. Citing *In re Lewis' Estate,* 344 Pa. 586, 26 A.2d 445 (1942), Appellants also argue that laches, and presumably acquiescence, does not apply because Appellants could not have been expected to scrutinize Trustees' management of Trust assets prior to their grandmother's death. We disagree.[5]

¶ 30 As a prefatory matter, laches and acquiescence are distinguishable doctrines, although laches may consti-

---

5. Warden III relies in part on 20 Pa.C.S. § 7780.3. He fails, however, to acknowledge that the statute became effective on November 6, 2006, after the completion of the accounting at issue, which spanned the period of January 1, 1987, through July 30, 2004.

tute evidence of acquiescence. *In re Wilbur's Estate,* 334 Pa. 45, 55 n. 7, 5 A.2d 325, 331 n. 7 (1939) ("While acquiescence is akin to the doctrine of laches the two doctrines are by no means the same, a much more definite assent to the acts complained of being required in the former than the latter, although laches may be evidence of acquiescence and sometimes has been held to be its equivalent.") (quoting *Lux v. Haggin,* 69 Cal. 255, 10 P. 674, 678 (Cal.1886)). It is well-settled Pennsylvania law that

> a beneficiary who consents to an act or omission by the trustee which would constitute a breach of trust cannot hold him liable for the consequences of the act or omission if the beneficiary had full knowledge of all relevant facts and of his legal rights, and if his consent was not induced by any improper conduct of the trustee. What constitutes consent, affirmance or acquiescence of a fiduciary's unauthorized conduct is a mixed question of fact and law which must in each case depend largely upon its own circumstances. Express requests, subsequent approval, participation in the proper activity or acceptance of the benefits of the breach will estop a trust beneficiary from holding the trustee accountable for his breach.

*Zampetti v. Cavanaugh,* 406 Pa. 259, 267, 176 A.2d 906, 910 (1962) (citations omitted). A beneficiary believing a trustee's action is improper has an affirmative duty to speak. *In re Macfarlane's Estate,* 317 Pa. 377, 382–83, 177 A. 12, 15 (1935). "A competent beneficiary who with full knowledge of the facts and of his rights expressly consents to or affirms an investment by the trustee cannot, in the absence of fraud, thereafter question its propriety." *Id.*

¶ 31 Laches, similar to a statute of limitations, may bar a party from seeking equitable relief after the lapse of a certain period, usually six years. *Scharlach,* 809 A.2d at 383 (citing *Sprague v. Casey,* 520 Pa. 38, 45, 550 A.2d 184, 187–88 (1988)); *see Potter Title & Trust Co. v. Frank,* 298 Pa. 137, 141, 148 A. 50, 52 (1929) (holding that a plaintiff's eight-year delay in bringing suit constituted an abandonment of his claim); *McGrann v. Allen,* 291 Pa. 574, 580, 140 A. 552, 554 (1928) (finding that laches barred the plaintiff's claim where he could have demanded an accounting twelve years earlier); *Taylor v. Coggins,* 244 Pa. 228, 231, 90 A. 633, 635 (1914) (*per curiam*) (agreeing with trial court's statement that "Suits brought after the period of time that the law prohibits actions at law are looked upon with suspicion and ... it is a rare case that survives if more than six years old."). "Laches bars relief when the complaining party is guilty of want of due diligence in failing to **promptly** institute the action to the prejudice of another." *Sprague,* 520 Pa. at 45, 550 A.2d at 187 (emphasis added).

> Laches is not excused by simply saying: "I did not know." If by diligence a fact can be ascertained the want of knowledge so caused is no excuse for a stale claim. The test is not what the plaintiff knows, "but what he **might have known,** by the use of the means of information within his reach, with the vigilance the law requires of him."

*Taylor,* 244 Pa. at 231, 90 A. at 635 (quoting *Scranton Gas & Water Co. v. Lackawanna Iron & Coal Co.,* 167 Pa. 136, 152, 31 A. 484, 485 (1895)) (emphasis added). Laches will bar a party's ability to interpret or enforce a trust if such action is not brought within a reasonable period of time. *Id.* at 230–31, 90 A. at 635.

> Thus, in order to prevail on an assertion of laches, [the trustees] must establish: a) a delay arising from [the appellants'] failure to exercise due diligence; and, b) prejudice to the [trustees] resulting

from the delay. Moreover, the question of laches is factual and is determined by examining the circumstances of each case.

*Sprague*, 520 Pa. at 45, 550 A.2d at 187–88 (citations omitted).

¶ 32 The general rule is that laches and acquiescence will not bar a beneficiary's surcharge action prior to the period when the beneficiary's interest attached if the beneficiary's demand for an accounting occurs promptly after the life tenant's death. *See In re Lewis' Estate*, 344 Pa. at 594, 26 A.2d at 449 (demanding accounting three months after the life tenant's death); *Montgomery's Appeal*, 77 Pa. 370, 373 (1875) (finding that the appellees made the claim "as soon as they could do so with effect"). Where, however, the life tenant does not object during his or her lifetime and the beneficiary does not promptly demand an accounting, laches and the life tenant's acquiescence bar the beneficiary's claims. *See In re Wilbur's Estate*, 334 Pa. at 55, 5 A.2d at 331.

¶ 33 We observe the Pennsylvania Supreme Court's differing conclusions in *In re Wilbur's Estate* and *In re Lewis' Estate* are reconcilable. In *In re Wilbur's Estate*, the Court specifically found that, based on the life tenant's receipt of annual statements, the life tenant was sufficiently informed of the trust's administration. In re Wilbur's Estate, 334 Pa. at 57, 5 A.2d at 332 ("[I]n the circumstances [the life tenant] must be regarded as having been sufficiently advised of the facts, or of what he would have learned if he had inquired as to any subject on which he considered the statements inadequate."). The Court thus held that acquiescence barred the life tenant and exceptant from objecting to transactions occurring over fifteen years earlier. *Id.* at 55, 5 A.2d at 331. In *In re Lewis' Estate*, the trustee breached a fiduciary duty by acquiring and retaining illegal securities. *In re Lewis' Estate*, 344

Pa. at 593–94, 26 A.2d at 449. The Court found that laches did not bar the appellees' claims because the appellees were not aware of the illegal securities' presence until after the life tenant's death and because the appellees promptly sued three months after the life tenant's death. *Id.*

¶ 34 *In re Wilbur's Estate* is factually analogous to the facts of this case. First, Appellants' grandmother never objected to or complained about Trustees' management of the Trust. *See In re Wilbur's Estate*, 5 A.2d at 331. Second, none of the other beneficiaries objected to the Trust's administration prior to 2004. *See id.* Third, Appellants did not demand an accounting until four years after succeeding to their grandmother's interest. *See id.* Fourth, unlike the appellees in *In re Lewis' Estate*, Appellants were aware of the Trust's high concentration of SGI stock in 1987, thirteen years prior to becoming beneficiaries, and for four years after becoming beneficiaries. *See In re Lewis' Estate*, 344 Pa. at 593–94, 26 A.2d at 449. Further, Appellants had an affirmative duty to inquire if they were concerned about the Trust's administration. *See In re Macfarlane's Estate*, 317 Pa. at 382–83, 177 A. at 15. Finally, we observe *Hansel* is not squarely on point for Appellants because that case addressed the duties of executors and partners, as opposed to trustees, with respect to fraudulent concealment of information. *See Hansel*, 446 A.2d at 1299. We thus discern no error in the trial court's application of the doctrines of acquiescence and laches. *See In re Estate of Cherwinski*, 856 A.2d at 167. Accordingly, we affirm the order having discerned no abuse of discretion or error of law. *See id.*

¶ 35 Order affirmed.