# In re Onorato

C.P. of Philadelphia County, O.C. No. 514 PR of 2012

*Denis A. Gray*, for accountant.
*Edward Gilson*, for objectant/principal.

HERRON, *J.*, July 1, 2014—

## Introduction

The account filed by an agent under a power of attorney granted by Mary Green raises the issue of whether the agent should be surcharged for breaching his fiduciary duty. Both the account and the agent's shocking testimony reveal that he failed to exercise the powers for the benefit of the principal; he failed to keep a full and accurate record of all actions, and; and he did not exercise reasonable caution and prudence when he expended the principal's assets to benefit himself and his family. Based on this record, he is surcharged $283,055, which shall be returned to Mary Green.

## Background

Mary Green executed a general power of attorney dated April 5, 2006 to appoint Antonio Onorato as her agent.[1] Six years later, Ms. Green filed a petition to obtain an accounting from Onorato after she learned that her residence at 487 Robbins Avenue, Philadelphia, had been subject to a lien

---

1. Ex. R-3.

due to nonpayment of real estate taxes. After consulting an attorney, she revoked the power of attorney.

Mr. Onorato filed his account on May 28, 2013. On its face, the account raised serious concerns. Although Onorato, as agent, had initially received $551,556.14 in principal, by the end of his agency there was nothing left. The details in the accounting were also troubling. The account revealed, for instance, that Antonio Onorato had signed $117,050 in checks that were made out to himself. Mr. Onorato also signed checks totaling $8,000 that were made out to his son, Salvatore, as well as a $700 check for his wife, Josephine. There were bank service charges for overdrafts and fees totaling $1,105. The account listed undocumented "cash withdrawals" of $13,121. "Online/ electronic banking deductions" with an unknown name of issuer totaled $27,185.64. Finally, nearly six pages in the account listed a staggering $109,988.91 in expenditures for unknown payees and issuers because "cancelled checks were not available."[2]

Not surprisingly, Mary Green filed numerous objections to this account. After a period of discovery, Mr. Onorato submitted a supplemental account (Ex. R-1) to provide the names of the payees and issuers for the $109,988.91 expenditures listed in the original account.[3] According to this supplemental account, Antonio Onorato had signed $66,850 in checks made out to himself. He signed $7,000 in checks made out to his son Marco Onorato. Mr. Onorato signed checks totaling $2,245.81 to PECO to provide electricity to his own residence at 815 Llanfair Road in Philadelphia. He also signed checks totaling $376 to pay

2. 5/28/13 Account at 24.
3. Ex. R-1.

for gas service to his own residence as well as $8,227.00 to pay school taxes on his residence in Abington Township.

In light of these glaring irregularities, a hearing was held on the objections. Mr. Onorato testified that prior to retiring, he had been a handyman and tailor. In 2000, he was introduced to Mary Green ("Mary") by her cousin for whom he had done home repairs. From 2000 to 2006, he saw Ms. Green three or four times a week. During these visits, he took her shopping or did whatever she needed at her house. On Sundays, she came over to Mr. Onorato's house for dinner. He testified that around 2006 he noticed that Mary did not look well and advised her to see a doctor who diagnosed her as suffering from colon cancer. After her operation, she returned home and Mr. Onorato brought food to her every day. He was also aware that Mary had vision problems and suffered from macular degeneration.[4]

According to Mr. Onorato, Mary told him that she did not want to go into a nursing home as some of her relatives advised. She asked him to fix up a house she had at 815 Llanfair Road, but after spending $10,000 on the roof, he discovered termites and concluded it "was impossible to repair that house." He testified that Mary then told him to "[b]uild a house over there."[5] She also told him that she wanted to do something for him by naming him power of attorney. And, in fact, she contacted an attorney on her own, Craig Falcone, who prepared several documents for her signature.[6] On April 5, 2006, she executed the general power of attorney appointing Antonio Onorato as her agent (Ex. R-3); she signed a will appointing Onorato as

---

4. 9/17/13 N.T. at 11-13 & 60 (Onorato).
5. 9/17/13 N.T. at 14 (Onorato).
6. 9/17/13 N.T. at 14-15 (Onorato). *See also* Ex. R-15 (9/12/13 Deposition of Craig Falcone, Esquire).

executor and primary beneficiary of her residuary estate (Ex. R-4); and she appointed Onorato to act on her behalf under a medical power of attorney (Ex. R-5).

Mr. Onorato constructed a new house on the 815 Llanfair property which, he asserts, Mary gifted to him by the deed she signed on August 3, 2006.[7] He explained that Mary had wanted him to fix it up so she could live there with him rather than having to go to a nursing home. Throughout this period, Onorato maintained that Mary was aware the he was building the house and consented to all the expenditures for it because she knew "I only make $1,000 a month in my pension."[8] When asked how often Miss Green used to watch him build it, Onorato candidly replied: "She came a few time."[9] When the house was finished, Onorato moved into it. Mary came over for Sunday dinners,[10] but never moved in herself. Nonetheless, Mary signed checks to pay for the architect, insurance, lumber, cabinets and Johnny-on-the Spot at the construction site. (Ex. R-9).

Mr. Onorato admitted that he wrote checks from Mary's accounts to cover expenses at his own properties because he asked and she told him he could do so. For example, he wrote checks from her account to pay PGW bills and water bills for 2316 Faunce Street which he owned.[11] He also testified that most of the checks that he wrote to himself were to pay for the construction of the house at 815 Llanfair Road.[12] He paid the real estate taxes on

---

7. 9/17/13 N.T. at 18-19 (Onorato); Ex. R-7
8. 9/7/13 N.T. at 19-21 (Onorato).
9. 9/7/13 N.T. at 20-21 (Onorato).
10. 9/7/13 N.T. at 21 (Onorato).
11. 9/7/13 N.T at 30-32 (Onorato); Ex. R-13 at 0116; Ex. R-14 at 0139.
12. 9/7/13 N.T. at 33 (Onorato).

his residence at 815 Llanfair Road from Mary's account which he explained:

> Because she told me to pay the tax. Because let's say this way. I only made $1,000 a month, my pension. If she wouldn't told me to build the house, I wouldn't have no reason to do the house, because I can't afford to pay the tax. So she said pay the tax for the house on Faunce Street, for the house Godfrey Avenue, one she have on Godfrey where she living now and the 815 Llanfair Road.[13]

On cross-examination, Onorato was asked about this co-mingling of funds and how it could be reconciled with the acknowledgment provision in the power of attorney document he signed that stated: "I shall keep the assets of the principal separate from my assets." Ex. R-3 at 6. His response: "Well, to tell you the truth, I don't read that."[14] He also stated he had not read the other provisions of the acknowledgment which stated in full:

> I shall exercise the powers for the benefit of the principal.
>
> I shall keep the assets of the principal separate from my assets.
>
> I shall exercise reasonable caution and prudence.
>
> I shall keep a full and accurate record of all actions, receipts and disbursements on behalf of the principal.
>
> Signed: Antonio Onorato Date: 4-5-06[15]

---

13. 9/7/13 N.T. at 38-39 (Onorato).
14. 9/7/13 at 42 (Onorato).
15. Ex. R-3 at 6.

In fact, he admitted that he had never kept a record of the checks he wrote for Mary. And when asked: "Now, when you talk about all the bills, you're talking about her bills; you're talking about your bills," Onorato replied, "Right."[16] Although Mary pays most of the bills for the 815 Llanfair Road property where Onorato resides, she never lived there.[17] In his defense, Mr. Onorato stated that all the checks he made out to himself totaling $117,000 in the initial account had been gifts or house building expenses, though he also conceded no gift taxes had ever been paid. The supplemental account also lists $66,850 in checks that Onorato signed and made out to himself. These checks, Mr. Onorato explained, were for his residence at Llanfair Road.[18]

Mr. Onorato further testified that after Mary cashed a check she had signed for $88,000, she gave that money to his wife, Josephine, to buy a house at 7968 Castor Avenue. The supplemental account lists a check 1803 for $3,000 to pay for zoning at this property.[19] Mary's name is not on the deed of the Castor Avenue property. When asked to explain how it was in Mary's interest to pay for his wife's house, he responded that "Well, she live with us. She's family."[20] Mr. Onorato acknowledged that Mary had yet to move into the Llanfair house: "She don't want to come and live with me. She can come today. It's no problem."[21] When asked if all these transfers out of Mary's account were for estate or Medicaid planning, Mr. Onorato stated

16. 9/17/13 at 43.
17. 9/17/13 N.T. at 46-50 (Onorato).
18. 9/17/13 N.T. at 50-51 (Onorato)
19. 9/17/13 N.T. at 53-55, 57 (Onorato); Ex. R-1 at 11.
20. 9/17/13 N.T. at 55 (Onorato). *See also* 9/17/13 N.T. at 53-54.
21. 9/17/13 N.T. at 67 (Onorato).

"I don't know what you mean by that."[22]

Mary Green testified that she had asked Onorato to be her power of attorney "to take care of the financial concerns about me" and she had trusted him.[23] She stated that all the money went to Onorato and that she would ask him for it when it was needed but she hesitated to do so.[24] It had not been her intent, she testified, that Onorato could do whatever he wanted with her money.[25] She stated she had never moved into the Llanfair Road residence that Onorato built and had never spent even a night there.[26] She denied that she had intended the Llanfair Road house be a gift to Onorato with a response reflecting both befuddlement and innocence:

Q: Do you recall signing checks for the benefit — to build the house, for the architect, to the electrician?

A: I don't remember signing, signing, signing, signing, signing. I knew that I was doing my check and then getting enough money out that he could pay his people. That was my — *and it wasn't a gift, no gift this.* It's maybe I can help you out with making the money available for people to do the job. You're going to build a house, good.

9/17/13 N.T. at 88 (Green)(emphasis added).

According to Mary, Mr. Onorato never told her she could live with him at anytime:

Q: Did Mr. Onorato say you can live there with him

_____
22. 9/17/14 N.T. at 56,
23. 9/17/13 N.T. at 78, 79 (Green)
24. 9/17/13 N.T. at 80 (Green)
25. 9/17/13 N.T. at 81 (Green).
26. 9/17/13 N.T at 83.

anytime?

A: No.

9/17/13 N.T. at 90.

Ms. Green also denied that she had asked to live with anybody:

No, never mentioned that. I'm an only child, so I make my own fun. No, I didn't. Some people are. That's a shame. They can't stand not to have somebody with them.

9/17/13 N.T. at 91.

## Legal Analysis

Under Pennsylvania statutory and common law, an agent under a power of attorney has a fiduciary relationship to his or her principal. *See, e.g.*, 20 Pa.C.S. § 5601(e); *Nicely Estate*, 18 Fid. Rep. 2d 397, 403 (Phila. O.C. 1998) (Pawelec, J.). In the present case, Mary Green as principal has filed objections to the account filed by her agent Antonio Onorato. In objecting to that account, Ms. Green has the initial burden of showing that Onorato breached his fiduciary duty to her:

There can be no doubt that the person attempting to prove an account inaccurate must sustain the burden of establishing his position. As a logical extension thereof, those who seek to surcharge a fiduciary for breach of trust must bear the burden of proving the particulars of the fiduciary's wrongful conduct.

*Dunn Estate*, 54 Pa.D. & D. 2d 760, 761 (Mercer Cty. 1972)

In seeking to recover assets Onorato allegedly misused as her agent, Mary Green is essentially seeking to surcharge him. This is because it "is well settled in this Commonwealth that a fiduciary who has negligently caused a loss to an estate may properly be surcharged for the amount of such loss." *Estate of Lohm*, 440 Pa. 268, 273, 269 A.2d 451,454 (Pa. 1970). Under Pennsylvania law, a "surcharge is the penalty for failure to exercise common prudence, common skill and common caution in the performance of the fiduciary's duty and is imposed to compensate beneficiaries for loss caused by the fiduciary's want of due care." *In re Miller's Estate*, 345 Pa. 91, 26 A.2d 320, 321 (Pa. 1942).

As an agent or fiduciary, Onorato was "required to use such common skill, prudence and caution as a prudent man, under similar circumstances, would exercise in connection with the management of his own estate." *Estate of Lohm*, 440 Pa. at 273, 269 A.2d at 454. Once the objector comes forward with evidence of wrongful conduct, the burden shifts to the accountant to prove due care. *Estate of Maurice*, 433 Pa. 103, 108,249 A.2d 334, 336 (1969). As the Pennsylvania Supreme Court in *Strickler Estate* explained:

> Where a fiduciary claims credit for disbursements made by him, the burden rests upon the fiduciary to justify them. Proper vouchers or equivalent proof must be produced in support of such credits. Accountant's unsupported testimony is generally insufficient. *Strickler Estate*, 354 Pa. 276, 277, 47 A.2d 134 (Pa. 1946).

In the present case, the account initially filed by Antonio Onorato on its face revealed patent irregularities. Although initial principal receipts of $551,556.14 were

acknowledged, at the conclusion of the account the combined balance on hand was $0. There were checks made out to Antonio Onorato signed by Antonio Onorato in a total amount of $117,050. There were also checks signed by Antonio Onorato to his family members Salvatore and Josephine Onorato. There were utility bills and taxes for properties owned by Antonio Onorato that were paid from checks drawn from Mary Green's account. There was a charge totaling $1,105.00 for numerous overdrafts and other bank fees. There were unexplained "cash withdrawals" totaling $13,121.00. There were online/electronic banking deductions with "name of issuer unknown" totaling $27,185.64. There were checks issued listed on pages 24-29 where the payees and issuers were "unknown" for a total amount $109,988.91.

In her objections, Mary Green focused on these irregularities. Once Ms. Green came forward to identify these issues and in light of the patent irregularities, the burden fell on Antonio Onorato to explain and support these disbursements with documentation or other evidence. In the *Estate of Lohm*, 440 Pa. 268, 274, 269 A.2d 451, 454 (Pa. 1970), for instance, the Pennsylvania Supreme Court stated that "where a large overpayment in taxes has been shown, such as in the case at bar, the burden then shifts to the fiduciary to present, if possible, exculpatory evidence and thereby avoid the surcharge." Accord *Estate of Maurice*, 433 Pa. 103, 108, 249 A.2d 334, 336 (Pa. 1969) ("This glaring error in overpayment of tax having been shown, it is the burden of the executor to come forward with evidence to prove that, in handling the federal estate tax matters, it used common skill, prudence and due care under the circumstances"). With his shocking testimony,

Antonio Onorato definitively established his breach of fiduciary duty to his principal Mary Green.

As a threshold issue, the acknowledgement that Onorato signed in April 2006 as part of the power of attorney executed by Mary Green clearly set forth his fiduciary responsibilities to her:

> I shall exercise the powers for the benefit of the principal.
>
> I shall keep the assets of the principal separate from my assets.
>
> I shall exercise reasonable caution and prudence.
>
> I shall keep a full and accurate record of all actions, receipts and disbursements on behalf of the principal.
>
> Ex. R-3 at 6.

These basic responsibilities are not merely set forth in the document Onorato signed but they mirror the statutory language applicable to agents under a power of attorney. *See* 20 Pa.C.S. §5601(d) & (e). In 1999, the Pennsylvania legislature enacted the provisions set forth in 20 Pa.C.S. §5601 (d) & (e) to clarify the fiduciary duties when an agent acts pursuant to a power of attorney. The power of attorney signed by Mary Green in 2006 is clearly subject to these statutory provisions. In a very recent case focusing on whether an agent should be surcharged for breaching his fiduciary duty to keep accurate records prior to 1999, the Pennsylvania Superior Court required a lower court to analyze the agent's testimony and evidence under the *Strickler* standard. *Estate of Bechtel*, __ A.3d__, 2014 WL 2048380 (Pa. Super. 5/19/14) at *4.

In the present case, the agent was specifically asked whether he had adhered to the responsibilities or standard of care outlined in the Acknowledgment he had signed. In response, Onorato bluntly admitted: "Well, to tell you the truth, I don't read that."[27] In terms of the specific four requirements of the Acknowledgment, Onorato's testimony revealed a total disregard for all of them. Instead of exercising his powers to benefit Mary, Onorato agreed that "[b]asically when you became power of attorney, what your testimony is that she basically said, Tony, whatever you want to do, you sign."[28] After emphasizing the attention he had paid to Mary for the six years prior to his appointment as agent, Onorato characterized the power of attorney as an expression of appreciation rather than a serious fiduciary responsibility:

> She says to me she wants to find — she said, Tony, I want to do something for you. I said, what do you want to do? She said, I want you to be power of attorney. I said you don't have to do that. No, she said, I want to do that.[29]

Mary Green, in contrast, testified that she had appointed Onorato as her agent "to take care of the financial concern about me and general concerns."[30] This complies with the standard role of an agent but is at odds with Onorato's behavior in which he used his power of attorney to benefit himself and his family at Ms. Green's expense as he admits in the following colloquy:

> Q: Let me ask you this here. I'm listening to you testify and basically you were paying all the bills?

27. 9/17/13 N.T. at 42 (Onorato).
28. 9/17/13 at 44.
29. 9/17/13 N.T. at 14-15 (Onorato).
30. 9/17/13 N.T. at 78 (Green).

A: Yes.

Q: Now, when you talk about all the bills, you're talking about her bills; you're talking about your bills.

A: Right[31]

In so doing, by using her assets to pay for utilities and taxes on his own properties, Mr. Onorato failed to conform to the obligation to "keep the assets of the principal separate from my assets." This is demonstrated more specifically when he responded as follows to questions about his payment of real estate taxes reflected in the account:

Q: And real estate taxes of over $3,000 for your benefit.

A: I don't know if it was mine or hers. I don't know. I have to see the check. It could be her house.

Q: The ones for $1600, in that area, they were yours; right?

A: $1,600?

Q: That's the amount of your real estate tax, 16 hundred something?

A: Where? On what house?

Q: Faunce.

A: Probably, yeah.[32]

In his initial account, moreover, Mr. Onorato reveals that he spent $4,706.82 on real estate taxes on the property located in Abington County where he resided.[33] According

31. 9/17/13 N.T. at 43 (Onorato).
32. 9/17/13 N.T. at 63 (Onorato).
33. *See* 5/28/13 Account at 17; 9/17/13 N.T. at 18 (Onorato confirm-

to the supplemental account, he spent $8,277 for the school taxes on his Abington property.[34]

Another obligation of an agent to "keep a full and accurate record of all actions, receipts and disbursements on behalf of the principal" was also blatantly disregarded by Onorato. He admitted, for instance, that he did not keep a check register or record of the checks he wrote.[35] This is reflected in his initial account with its numerous pages (i.e. 24-29) listing checks that were issued with no identification of the payees or issuers even though the total expended was $109,988.91. In an admission of the inadequacy of such an "account," Mr. Onorato filed a supplemental account which is no less disturbing in what it revealed. That supplemental account conceded that of these previously unexplained checks, Antonio Onorato had signed checks made out to himself in the amount of $66,850. He wrote out checks totaling $7,000 to his son Marco. Ex. R-1

As an explanation for his expenditures that benefited himself and, in particular the house he constructed on the property at 815 Llanfair Road in Abington, Onorato repeatedly maintained that these had been gifts from Mary. In his brief, Onorato argues broadly that such "gifts" to himself, his wife and his children were supported under the terms of the power of attorney Mary executed which provided for "unlimited gifts."[36] According to this

_____

ing that he resides in Abington).

34. Ex. R-1 at 7.

35. 9/17/13 N.T. at 43 (Onorato).

Q: A record of your checks. A record of the checks you drew for Miss Green. You didn't have one, did you?

A: No, I don't.

Q: No. I know you didn't.

A: I don't.

36. 11/14/13 Onorato Brief at unnumbered (at 4-7).

argument, the general power of attorney "provides for unlimited gifting" and the payments to Onorato and his family "were consistent with Ms. Green's estate planning that had been in place as well as the continuation of gifts that she made herself to Mr. Onorato and his family."[37] This argument is belied by the terms of the power of attorney as well as the testimony of Mr. Onorato and Ms. Green.

The gift provisions in the power of attorney Mr. Onorato invokes in his brief provides in relevant part:

23. Gifts. My agent may make gifts in any amount to anyone, including my agent, outright or in trust *so long as my agent believes that such gifts are consistent with appropriate lifetime, estate planning or Medicaid planning goals*.... I direct my agent to keep in mind my objective of utilizing all public resources that are available for the payment of long-term care expenses, and hereby authorize my agent to do the following in order to accomplish this objective: (i) to divest me of sufficient assets so as to qualify for Medicaid; (ii) to convert non-exempt resources into exempt resources allowable under federal and state Medicaid rules and regulations; or (iii) to change my domicile to another state where Medicaid eligibility rules are more favorable. In the event that my agent shall act upon my objectives, any gifts or transfers from my estate shall not constitute a breach of agent's fiduciary relationship to me.

Ex. R-3 at ¶23 (emphasis added).

This provision as to gifts is not unlimited or unconditioned. It clearly requires that any gift the agent makes is "consistent

---

37. 11/14/13 Onorato Brief at unnumbered (7).

with appropriate lifetime, estate planning or Medicaid planning goals." In other words, the gifts should benefit Ms. Green during her lifetime or as necessary to maneuver the complicated Medicaid rules for "utilizing all public resources that are available for payment of long-term care expenses." Onorato, however, testified that he was oblivious to the estate planning or Medicaid provision for gifts when he was asked about his wife's purchase of property with $88,000 from Mary's funds:

Q: Did your wife purchase property at 79 — I think it's blocked actually, 7968 Castor Avenue?

A: Yes.

Q: For $80,000?

A: $88,000.

Q: 88

A: Betty told me to buy that property...

A: I told her that I have a property that I think that's interest. She said buy it. And she give me the check, yes.

Q: Is Betty's name on that deed anywhere?

A: No, it isn't.

Q: Whose name is on it?

A: My wife name.

Q: Just your wife?

A: Yes.

Q: Now, so you indicated with this acknowledgment, you know, you're supposed to act in Betty's best interest.

A: Yeah, she told me to buy it for myself.

Q: Can you explain to me how that's in her best interest: Her name is not on it.

A: Well, she live with us. She's family.

Q: Oh, she's family. So this was — let me ask you this here, was this estate planning? Because I understand you have the power to do estate planning under the power of attorney.

A: Yeah.

Q: Was it estate planning or was it Medicaid planning? Because I understand you have that power, too.

A: *I don't know what you mean by that.*[38]

Not only did Mr. Onorato confess he did not know the meaning of "Medicaid planning," but he produced no documentation or evidence of how this gifting was part of a general scheme to provide for Mary's lifetime planning, estate planning or Medicaid planning beyond the bald assertion that she gave $88,000 to Onorato's wife for the purchase of property never placed in Mary's name. The gift provision in the power of attorney ·did not provide Onorato with a license to loot Mary's assets. As her agent, his duty was "to exercise the powers for the benefit of the principal." Ex. R-3 at 6.

The record therefore establishes that Mr. Onorato

---

38. 9/17/13 N.T. at 54-56 (Onorato)(emphasis added).

breached his fiduciary duty to Mary in manifold ways: by failing to use his powers for her benefit; by failing to keep her assets separate from his assets; by failing to keep full and complete records of all actions, and; by failing to act with caution and prudence. It is still necessary, however, to go through each of the objections to determine their individual merit and the total surcharge properly assessed against Mr. Onorato.

As her first objection, Mary notes that while the account shows receipts of over $500,000, there is no balance remaining. The account, however, indicates that many of the checks were written by Mary herself. Her testimony likewise confirmed that she wrote certain checks, and those cannot serve as a basis for a surcharge against Mr. Onorato. Objections 2-3 complain about reductions in Mary's social security benefits in 2007 and 2010 but no evidence was presented that would link the agent to those reductions. In fact, he specifically — and convincingly — testified that he had nothing to do with the size of these payments.[39] Likewise, objection 4 that Mary's Metropolitan Life Annuity abruptly stopped in December 2008 was undeveloped and did not cause the burden of proof to shift to the agent. The fifth, sixth and seventh objections concerning transfers and deposits to a PNC money market account were not developed or explained and are thus deemed abandoned.

With her eighth objection, Mary asserts that the $117,050 in checks that Onorato made out to himself were improper. Because the agent was unable to provide documentation or support for these expenditures other than the bald assertion of gifts, he shall be surcharged $117,050.

---

39. 9/17/13 N.T. at 29 (Onorato).

As her ninth objection, Mary asserts that the accountant signed checks payable to his own family members in the amount of $89,000. The account and supplemental account, however, show the following improper checks to relatives signed by Antonio Onorato: $8,000 to Salvatore Onorato; $900.00 to Josephine Onorato; $11,544.48 to Marco Onorato. These improper payments shall be surcharged against Antonio Onorato.[40]

In objections 10 through 12, Ms. Green objects to payments made to PGW, PECO, the Water Revenue Bureau and taxing authorities on three of four different unidentified accounts. Based on the testimony and records produced at the hearing — especially exhibits R-12 through R-14 which identified the various accounts by property — the following expenditures by checks signed by Mr. Onorato for properties belonging to Onorato or his family were improper and are subject to surcharge:

Initial Account

$337.25: Payable to "PGW" (Gas service account no. 411213571)

$1,360.74: Payable to "PECO Energy" (Electric service account 44340-83006)

$45.40: Payable to Water Revenue Bureau (Account 059-33660-02316-001)

$4,706.82: Payable to "Abington Township Treasurer (Real estate taxes)

Supplemental Account

---

40. *See* 5/28/13 account at 8,9 & 23; Supplemental Account (Ex. R-1) at 3.

$2,245.81: Payable to "Peco Energy" (Account 44340-83006)

$ 376.72: Payable to "PGW" (Account 4112135711)

$8,227.00: Payable to "Abington Township Treasurer" (School taxes)

Objection 13 focuses on payments to three different homeowner insurance policies, but this objection was not developed with a specific amount due and is deemed abandoned.

As objection 14, Ms. Green objects to the $1,105 in bank and overdraft charges to her PNC checking account as set forth in pages 17-18 in the initial account, which is surcharged against her agent for his negligent breach of fiduciary duty.

Ms. Green next objects to the $27,185.64 in online/ electronic banking deductions that are set forth on pages 19 through 22 of the account with the notation "name of issuer unknown." More specifically, Ms. Green notes that she did not know how to make electronic charges, and by implication they should be surcharged against the accountant who failed to provide any explanation for these deductions.[41]

The initial account listed $109,988.91 in checks for which the issuer and payee were unknown, which Ms. Green properly objected to as unacceptable record-keeping.[42] In a tacit concession, Onorato submitted a supplemental account to "explain" these disbursements.

---

41. 6/25/13 Green Objections at ¶15 & 21; 5/28/13 Account at 19-20.
42. 6/25/13 Green Objections at ¶16 & 20-21; 5/2813 Account at 24-29.

*See* Ex. R-1. This supplemental account unfortunately documents the improper nature of many of these disbursements. According to the supplemental account, Onorato signed checks made out himself in a total amount of $66,850.00.[43] He also made out checks totaling $7,000 to his son Marco Onorato and $200 to his wife Josephine.[44] The supplemental account also states that he signed checks for PECO energy and PGW for his home at 815 Llanfair Road and 2613 Faunce Street in the amounts of $2,245.81 and $376.72 respectively as well as checks totaling $8,277 for Abington Township school taxes.[45] Finally, the supplemental account documents that Onorato made out a check for $3,000 payable to Thomas Citro for a zoning hearing on the Castor Avenue house his wife purchased with $88,000 in funds provided from Mary.[46] While the $88,000 check that Mary signed to provide for this purchase is not subject to surcharge since she herself signed that check, the $3,000 that Onorato spent on zoning expenses by a check he signed is subject to surcharge.

Objection 17 focuses on a $15,000 check that Onorato signed payable to Carmine Morelli, builder that is listed on page 22 of the account. Although Onorato claimed that Mary gifted this property to her as evidenced by a deed she signed (N.T. at 19 and ex. R-7), he was unable to explain how Mary benefited from the house that he built on that property. In fact, he conceded that she did not want to live there. N.T. at 45; 67. In light of this failure to demonstrate how the building expenses benefited the

---

43. Ex. R-1 at 2-3.
44. Ex. R-1 at 3.
45. Ex. R-1 at 4 & 7.
46. Ex. R-1 at 11; 9/17/13 N.T. at 57 (this charge was for zoning of the Castor Avenue property that is in Josephine Onorato's name).

302

principal, this $15,000 expenditure is surcharged against the agent.

Mary also objects to the unexplained cash withdrawals in the total amount of $13,121 as set forth on page 19 of the account. No explanation was made for these expenditures. Hence, this $13,121 is surcharged against the agent.[47]

Mary's objection 19 as to $5000 used to cover Citicard credit card payments is denied because the account at page 17 indicates that two checks totaling $3,517.64 to cover citicard charges were signed by Mary.

In her final objections, Mary requests a surcharge in excess of $500,000 to recoup the improper payments or expenditures by her agent. The record, however, does not support this total claim since the account indicates that Mary herself signed numerous checks that fall within the total expenditures of $551,556.14. Her final objection 22 that the principal transferred her real estate at 815 Llanfair Road, Rydal, to her agent is undeveloped. Although this objection states that the principal's name does not appear of the deed for this property, it also concedes that "the principal transferred her real estate at 815 Llanfair road, Rydal, PA to her Agent who demolished it." This is an admission of voluntary transfer rather than a claim. Based on the record, the agent shall be surcharged for the following improper expenditures:

$ 117,050.00 checks made out to and signed by Antonio Onorato

$ 8,000.00 check payable to Salvatore Onorato signed

_____

47. 6/25/13 Green Objections ¶¶18 & 21.

by Antonio Onorato

$ 2,000.00 checks payable to "cash" signed by Antonio Onorato

$ 700.00 checks made out to Josephine Onorato signed by Antonio Onorato

$ 337.25 PGW check for 2613 Faunce Street singed by Antonio Onorato

$ 1,360.74 PECO checks for 815 Llanfair Road signed by Antonio Onorato

$ 45.40 water revenue expenditure for 815 Llanfair Road signed by Antonio Onorato

$ 4,706.82 taxes payable to "Abington Township Treasurer signed by Antonio Onorato

$ 1,105.00 bank overdrafts and fees

$ 13,121.00 unexplained cash withdrawals

$ 27,185.64 unexplained online/electronic banking deductions

$ 4,544.48 check to Marco Onorato signed by Antonio Onorato

$ 15,000.00 check signed by Antonio Onorato to Carmine Morelli, Builder

Supplemental Account

$ 66,850.00 checks made out to and signed by Antonio Onorato

$ 7,000.00 check for Marco Onorato signed by Antonio

Onorato

$ 200.00 check to Josephine Onorato signed by Antonio Onorato

$ 2,245.81 PECO payments for 815 Llanfair Road signed by Antonio Onorato

$ 376.72 PGW payments for 2613 Faunce Street signed by Antonio Onorato

$ 8,227.00 school taxes paid to Abington Township Treasurer signed by Antonio Onorato

$ 3,000.00 check signed by Antonio Onorato to Thomas Citro for zoning at Castor Avenue residence of Josephine Onorato

TOTAL: $ 283,055.86

## Conclusion

Because of the improper expenditures documented throughout the account and supplemental account, neither can be confirmed but shall be returned unaudited. The accountant, Antonio Onorato, is surcharged in the amount of $283,055.00 which he shall return to his principal, Mary Green as set forth in a contemporaneously issued decree.

Mr. Onorato mistakenly believed that Ms. Green had appointed him as her agent as an act of gratitude for past kindnesses and with permission to use her assets as he wished, In fact, a person appoints a power of attorney to protect his or her interests. This certainly was Mary Green's intent as set forth in the power of attorney and her testimony.