J-A23042-23

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: TRUST OF ELEANOR M. BULLOCK | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| | : | |
| APPEAL OF: ROSS BAXTER | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 348 MDA 2023 |

Appeal from the Order Entered January 27, 2023
In the Court of Common Pleas of Tioga County Orphans' Court at No(s):
14 OC 2020

BEFORE: LAZARUS, J., McLAUGHLIN, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED: NOVEMBER 28, 2023**

Appellant Ross Baxter appeals from the January 27, 2023, order entered in the Court of Common Pleas of Tioga County Orphans' Court, which removed him as a co-trustee of the Trust of Eleanor M. Bullock and denied his request to remove the remaining co-trustees. After a careful review, we affirm.

The relevant facts and procedural history are as follows: On December 17, 1998, the late Eleanor M. Bullock ("the Decedent") executed an irrevocable agreement of trust ("the Trust") between her and her son, Wayne Bullock ("Wayne"). The Trust owns approximately 100 acres of land with a house[1] and a cabin in Westfield Township, Tioga County, Pennsylvania ("the Property"). The Trust instrument expresses the Decedent's intent that the

---

[*] Former Justice specially assigned to the Superior Court.

[1] The house is used to generate rental income for the Trust.

Property be preserved for and used by Wayne, as well as six of the Decedent's grandsons: Noah W. Bullock ("Noah"), Zachary Bullock ("Zachary"), Benjamin Bullock ("Benjamin"), Appellant Ross Baxter ("Ross"), Samuel R. Moyer ("Samuel"), and Lloyd Moyer ("Lloyd").[2]  Further, the Trust instrument named Wayne as the original trustee; however, the Trust provided that, as each of the Decedent's six grandsons, who were named as beneficiaries, reached the age of thirty years, they could elect to become co-trustees.

Ross turned thirty years old in March of 2010, and on or about April 15, 2010, he provided notice to Respondents of his election of appointment as a co-trustee.  Thereafter, on February 13, 2020, Ross filed a "petition for citation to show cause why Respondents should not produce documents, trust assets should not be deposited in a Trust account with withdrawals prohibited, and Wayne Bullock be removed as a co-trustee."

On February 21, 2020, the Orphans' Court filed an order for citation directing a rule to show cause as to why the relief should not be granted, and on April 16, 2020, Respondents filed a preliminary objection seeking a more specific pleading. By order entered on April 27, 2020, the Orphans' Court directed Ross to file a more specific pleading.

On June 15, 2020, Ross filed an "amended petition to compel production of documents, for removal of trustee, and for reimbursement of expenses and

_____

[2] Wayne, along with Noah, Zachary, Benjamin, Samuel, and Lloyd shall be referred to collectively as Respondents. As discussed *infra*, Ross commenced the instant litigation.

attorneys' fees." Therein, Ross requested the Orphans' Court compel Wayne to produce a copy of the insurance policy for the Property, direct the rents and royalties paid to the Trust be frozen until further order of the court, order reimbursement to Ross for expenses he incurred in making repairs to the Property, and direct the Trust to pay Ross's attorneys' fees. Further, Ross sought a declaratory judgment regarding the interpretation of Section 6 of the Trust instrument as it relates to the maintenance of the Property, and he sought the removal of Respondents as co-trustees.

Eventually, the parties reached an agreement regarding the claims raised in Ross's amended petition. Accordingly, on October 1, 2020, the Orphans' Court filed a stipulated and a supplemental stipulated order resolving the claims.

Specifically, the Orphans' Court's stipulated order relevantly provided:

1. Necessary repair will be made on the shower and porch of the cabin, one of the two buildings on the subject property, and will be the subject of estimates to be obtained by [Ross], said estimates to be then forwarded to all interested parties for approval.

2. The Trust account will maintain a MINIMUM BALANCE of $5,000.00 for repair and maintenance of the buildings on the Property, same to be replaced in accordance with the Trust terms if the balance falls below that number.

3. The Trust account will include preliminarily all house rental income received.

4. [Ross] will receive $3,000.00 from the Trust by way of reimbursement for monies expended on behalf of the Trust for maintenance and repair. [Ross] will also submit receipts for any additional sums claimed up to a maximum of $3,200.00, the same to cover only materials utilized by [Ross].

5.      For future maintenance and repairs, parties will obtain estimates and submit them to the co-trustees for approval.

6.      Parties all agree that all of the trustees will meet either in person or by some other electronic means yearly to discuss any and all issues relating to the subject corpus of the Trust.

7.      Parties have approved this stipulation, and the Court APPROVES it as an ORDER resolving certain of the issues raised in this case.

Orphans' Court's Stipulated Order, dated 10/1/20 (capitalization for emphasis in original).

Further, the Orphans' Court's supplemental stipulated Order relevantly provided:

1.      Parties agree the Court can lift the stay on the joint bank account at PNC Bank, as well as lift the stay on a new account.

2.      Parties agree that the declaration action that was brought in the Amended [Petition]…, the understanding of the Trust terms, section 6, regarding distribution of monies that the Trust earns will be interpreted according to the Amended Petition. Specifically, being that the Trust requires the co-trustees to first use any monies generated by the Trust or the Property for maintenance, and only after that can it be used for income distribution to the beneficiaries in equal shares; and maintenance is the preservation of the *status quo* or restoration to approximate original condition.

3.      Parties have agreed that the fees of Peter Klenk can be reimbursed in the amount of $6,000.00 in attorneys' fees, and the fees of William Casey, likewise, in the amount of $6,000.00, can be reimbursed from the Trust.

4.      Parties have agreed that a proper Trust account will be opened at the Newtown Bank & Trust Company, provided that it is able to provide the services as outlined in the agreement that the parties have all agreed to.  The proper Trust account will be understood as a Fiduciary account registered under the EIN of the Trust.  The titling of the account will be the Trust and the co-trustees.  The account that is opened will allow for three individuals to be signators on checks, with those people being

Wayne Bullock, Ross Baxter, and then a third co-trustee to be elected by the seven co-trustees. Those three individuals will have check writing authority; however, all the checks will have to be signed by two of the three individuals to be valid checks.

5. Parties agree that of the various distributions that have been agreed to, both in the Stipulated Order, as well as this supplemental agreement, that those distributions will all be made, and the items to be paid will all be paid for BEFORE any income distributions can be made to the beneficiaries. The repayment before any distributions does not include the additional possible reimbursement above the $3,000.00.

6. It has been agreed by the parties that the Trust will have the Property mowed and cleared at least three times per year so it is accessible to all of the co-trustees, whether it be by someone doing it for free or by paying someone, the Trust will see that it is done as part of the routine maintenance.

Accordingly, the Court ACCEPTS the supplemental stipulation of the parties, and all matters raised in the petition will be deemed RESOLVED.

Orphans' Court's Supplemental Stipulated Order, dated 10/1/20 (capitalization for emphasis in original).[3]

On February 22, 2022, Ross filed a "petition of Ross Baxter for a citation directed to all co-trustees to show cause why an order should not be entered for removal of all beneficiaries/co-trustees as co-trustees and appointment of new trustee pursuant to 20 Pa.C.S.A. § 7766." Therein, Ross specifically requested the: "(1) removal of all beneficiaries/co-trustees as co-trustee, including [Ross], of the…Trust; (2) appointment of Larry Bullock as Trustee of

---

[3] As is evident by the Orphans' Court's stipulated order and supplemental stipulated order, the co-trustees were not removed as requested in Ross's amended petition.

- 5 -

the…Trust; or, in the alternative, (3) appointment of a Corporate Trustee of the…Trust." Ross's Petition, filed 2/22/22, at 1.

Ross averred the co-trustees' lack of cooperation had impaired the administration of the Trust, and their refusal to properly maintain the Property was inconsistent with the stated purpose of the Trust: for the Property to be used for "wholesome recreational purposes as it had been used by [Decedent] and [her] late husband." *Id.* at 6. In this vein, Ross averred that, although paragraph 1 of the stipulated order provides that Ross would obtain estimates for the necessary repairs to the cabin's shower and porch, other co-trustees obtained estimates and then unilaterally approved the work, which was completed in an unworkmanlike fashion without compliance to the building codes.

Moreover, Ross averred that, although paragraph 6 of the supplemental stipulated order provides the Property is to be mowed and cleared at least three times per year, the Trust failed to perform these duties. Ross averred he used his own time and money to mow the Property, and the Trust refused to reimburse him accordingly. Also, he averred that, although paragraph 2 of the supplemental stipulated order provides that distributions of Trust income will occur only after payment is made for the maintenance of the Property, the co-trustees have continued to distribute Trust income without making the necessary maintenance payments.

Ross asserted that Wayne's brother, Larry Bullock ("Larry"), who is not a beneficiary of the Trust, is willing and available to serve as the trustee. Thus, Ross requested the Orphans' Court appoint Larry as the sole trustee. Alternatively, Ross requested the Orphans' Court appoint a corporate trustee as the sole trustee.

The Orphans' Court filed an order for citation directing a rule to show cause as to why the relief should not be granted, and on April 29, 2022, Respondents filed an answer with new matter in opposition to Ross's petition. Respondents averred the cabin, which is an expanded chicken coop, has been used primarily by the family as a deer hunting camp, and it is being maintained as such by the Trust. Respondents averred Ross refuses to cooperate with Respondents as co-trustees and seeks sole control over the Property, which results in unnecessary litigation and fees. Accordingly, Respondents requested that Ross be removed as a co-trustee with the other co-trustees remaining intact.

On July 13, 2022, October 28, 2022, and January 19, 2023, the Orphans' Court held hearings on the matter. Relevantly, Ross testified he is a beneficiary of the Trust, as well as a co-trustee along with his uncle, Wayne, and five cousins. N.T., 7/13/22, at 4. He indicated that he visits the Property two or three times per year, and the primary purpose of the Property is for "recreation." *Id.* at 5. He testified "we go there, we hunt, we shoot, fish in the pond." *Id.* Referencing the Trust instrument, Ross testified the purpose

of the Trust is to use the Property "[f]or wholesome recreational purposes as it had been used by them and [the Decedent's] late husband, Joseph Bullock, during his lifetime." *Id.* at 6.

Ross testified that, per the court's stipulated order, Ross was to secure quotes for cabin repairs, and Ross did so. *Id.* Ross testified he emailed the quotes to the other co-trustees; however, the other co-trustees acquired their own quote from Bill Christ ("Mr. Christ"), who worked on the cabin's shower, floors, and front porch. *Id.* at 7-8. Ross noted he was dissatisfied with Mr. Christ's work. *Id.* at 8. When he expressed his dissatisfaction, the co-trustees "reclassified the cabin under the cabin exemption so they didn't have to qualify for the Pennsylvania Building Code." *Id.*

Ross testified he mowed the Property, and when he asked for reimbursement, he was told by the co-trustees that he was not entitled to reimbursement. *Id.* at 10. He confirmed he received a check for $6,000.00 from the Trust account for expenses he had incurred to repair the cabin's roof, as well as his attorneys' fees. *Id.* Ross testified he was not in favor of the Trust entering into leases with oil and gas companies for the Property. *Id.* at 11. He testified the purpose of the Trust was not to provide a financial benefit for the beneficiaries, and the leases "complicated" the situation between the co-trustees. *Id.* He also noted that income from the oil and gas leases is distributed to the beneficiaries monthly, and he believes the income should be held in the Trust account to ensure it is being used primarily for maintenance

of the Property. *Id.* at 12. Ross opined the "other trustees' primary motivation is to create income distributable to them." *Id.* at 15.

Ross confirmed he does not agree with the other co-trustees as to how the Trust is being administered. *Id.* at 12. He noted that, besides himself, Zachary is the other co-trustee who uses the Property regularly. *Id.* He noted that Ken Tombs has rented the house on the Property since the mid-1990's, and he pays $350.00 a month in rent. *Id.* Ross has "no idea" whether this is a fair market value for the rent. *Id.*

Ross indicated the co-trustees had a yearly meeting via email, and Wayne deemed this to be the annual meeting. *Id.* at 14. Ross testified that additional repairs are needed to the Property. *Id.* at 16. Specifically, the cabin's driveway, porch, plumbing, and oven need to be repaired. *Id.* Ross admitted that some of the other co-trustees have acknowledged repairs are needed; however, they want Mr. Christ to make the repairs, but Ross does not agree with their choice for a contractor. *Id.* at 20.

Ross testified he has informed the other co-trustees that he prefers the income from the oil and gas leases be used to make repairs instead of distributing the money to the co-trustees. *Id.* at 16. However, the other co-trustees have responded negatively. *Id.* at 17. He notes the other co-trustees call the cabin a "flop house" or "chicken coop," but he notes the Decedent did not view the cabin in such a manner. *Id.*

Ross indicated his ability to administer the Trust is substantially impaired because of the disagreements he has with the other co-trustees regarding the maintenance of the Property. *Id.* at 18. He would prefer that his uncle, Larry, or some other third party serve as the sole trustee with all present co-trustees remaining as beneficiaries only. *Id.* at 17-18.

On cross-examination, Ross admitted the Trust account has maintained a minimum balance of $5,000.00 as directed by the Orphans' Court's stipulated order. *Id.* at 23. However, Ross testified income distributions were made to the beneficiaries before all maintenance was completed. *Id.* at 24. He admitted the cabin's porch was repaired, but he disputed whether the repairs were adequate. *Id.* He admitted he informed Wayne that he didn't mind the other co-trustees getting estimates to repair the cabin's shower and porch; however, after Mr. Christ completed the work, Ross was dissatisfied with the quality of the work. *Id.* at 25-26.

Ross admitted Mr. Christ added a railing to the porch; however, Ross contended it was more like a barrier than a railing under the Pennsylvania State Building Code. *Id.* at 26. Ross admitted that, when he received a tax form that contained an incorrect year for the Property, instead of contacting Wayne, he called his attorney. *Id.* at 29-30.

Ross testified the Trust became effective in 1998, and Ross did not become a co-trustee until 2010. *Id.* at 32. He admitted Wayne "took care of everything up until" Ross became a co-trustee, and "there were no problems."

*Id.* Ross admitted the other co-trustees get along fine, take care of problems, and maintain a minimum of $5,000.00 in the Trust account. *Id.* However, he still objects to the co-trustees administering the Trust because he is dissatisfied with the quality of Mr. Christ's work, and Mr. Christ was selected by a majority of the co-trustees. *Id.* at 33. Further, Ross objects because he believes the co-trustees are only interested in making a profit off the Property and not enjoying it as the Decedent intended. *Id.* at 34. Ross admitted he believes the other co-trustees' motives are not "pure," so he will never be satisfied until a thirty party is appointed as the sole trustee. *Id.*

Ross admitted that, if any of the co-trustees want to communicate with him, they must contact his lawyer. *Id.* at 35. He admitted this procedure results in extra time and expense for the co-trustees, but since he doesn't agree with the co-trustees on issues, it is necessary. *Id.*

On redirect-examination, Ross confirmed he does not get along with the other co-trustees. *Id.* Ross testified he does not dispute the amount of income coming into the Trust account; however, he disagrees with the money being distributed to the beneficiaries instead of being spent on the Property. *Id.* at 45.

Zachary testified he has been a co-trustee since 2008, and he visits the cabin a couple of times each year. N.T., 10/28/22, at 8. He testified the purpose of the Trust is to preserve the Property for "wholesome enjoyment, recreational enjoyment." *Id.* at 8-9.

- 11 -

Zachary indicated he contracted with Mr. Christ to perform maintenance at the Property.  *Id.* at 9.  He noted that all co-trustees, except Ross, find Mr. Christ's work to be satisfactory, and Mr. Christ is reliable.  *Id.* at 19. Specifically, Mr. Christ completed work to the cabin's porch, floor, and plumbing.  *Id.* at 9.  Mr. Christ installed a new shower, fixed windows, mowed the lawn, repaired the driveway, and completed electrical work.  *Id.* Zachary testified he inspected the repairs made by Mr. Christ, and none of the repairs were substandard.  *Id.*

He noted Mr. Christ installed parts of new floor joists, which he "sistered" against existing floor joists.  *Id.* at 12.   He also installed a railing on the cabin's porch, to which Ross objected.  *Id.*  Zachary testified the co-trustees voted on how to have the repairs done, and all agreed except Ross.  *Id.* at 13.  He admitted Ross wanted to have repairs done to the cabin's upstairs porch, but Mr. Christ concluded the upstairs porch was "sound," so all co-trustees, except Ross, decided against the repairs.  *Id.* at 15.

Zachary indicated that, after the Orphans' Court filed the stipulated order and supplemental stipulated order, the Trust signed a contract with Mr. Christ to mow the Property six or seven times per year.  *Id.* at 10.  Zachary testified that, with the permission of a majority of the co-trustees, the Trust entered into oil and gas leases with companies. *Id.* at 17.  He indicated Ross initially indicated he was in favor of the leases, but he then changed his mind. *Id.*  He noted the oil and gas leases produce income, and money is distributed

monthly to the beneficiaries after maintenance costs for the Property are deducted. *Id.* at 18, 25.

He testified that the co-trustees act "on a majority vote." *Id.* at 18-19. Zachary acknowledged Ross is not satisfied with Mr. Christ or his work; however, Zachary indicated the Trust continues to hire him because "the remainder of the [co-trustees] are happy with [Mr. Christ's] work." *Id.* at 24. He noted that, although Ross has asked for the Trust to hire a new contractor to "fix" alleged problems with Mr. Christ's work, a majority of the co-trustees have voted "no" because they are satisfied with Mr. Christ's work. *Id.* at 25. Zachary indicated the cabin has "always been a cabin," but a majority of the co-trustees filed the necessary paperwork to officially have it classified as a cabin for purposes of the Building Code. *Id.* He admitted Ross was not in favor of this decision. *Id.*

Zachary testified Ross has requested that all income generated from the Property remain in the Trust account. *Id.* at 27. Zachary testified that, per the Orphans' Court's prior orders, the Trust maintains a minimum of $5,000.00 in the account to cover maintenance and repairs, and Zachary indicated this is sufficient. *Id.* He noted Ross disagrees with Zachary as to what repairs are classified as "maintenance" for the Property. *Id.* Zachary indicated "I would say there's a substantial disagreement between [Ross] and the rest of the co-trustees, as like a normal operation." *Id.*

Zachary noted that Ross agreed to have certain painting done on the rental house until Ross discovered Mr. Christ would be doing the painting. *Id.* Zachary testified that most of the time Ross does not offer an alternate contractor, so "everyone votes yes, [Ross] says no," and Mr. Christ performs the work on the Property. *Id.* Zachary noted that, since Ross demands that all communication between him and the other co-trustees flows through legal counsel, it is difficult to give Ross time to get quotes from other contractors to perform the repairs to the Property. *Id.* at 29.

Zachary testified annual meetings among the co-trustees occur via email. *Id.* at 30. He indicated that emailing is efficient for the co-trustees and provides a written record. *Id.* at 31. Given the relationship of the parties, Zachary opined that "real time communication" would not benefit the co-trustees. *Id.* at 36.

Zachary testified the Trust has an accountant, who files the taxes. *Id.* at 40. He testified that Ross has created disputes about the income, which is generated by the Property. *Id.* Specifically, Ross objects to the distribution of income to the co-trustees/beneficiaries in lieu of maintaining all of the income in the Trust account for repairs to the Property. *Id.* at 41. Zachary noted his mother, who is not a co-trustee, helps with the bookkeeping for the Trust, and all co-trustees, except for Ross, are happy for her assistance. *Id.* at 42. Zachary opined the Trust is being effectively managed. *Id.* at 43. He

opined the existing legal proceedings are due to one co-trustee, namely Ross, being "unhappy." *Id.*

Zachary testified he is not in favor of a third party acting as the sole trustee, and "nobody except for [Ross] wants that." *Id.* at 44. He indicated a third-party trustee is unnecessary, and he opined that Ross "only wants that because now he's put himself in a place where he feels like everyone is out to get him, and he is one vote among seven. And I think that he thinks, that if there was a third party, that perhaps he would have more sway or control." *Id.* Zachary noted that, if the Decedent wanted a third party to manage the Trust, as opposed to her son and grandsons, the Trust instrument would have so provided. *Id.* at 45. Zachary further noted the Trust runs by a majority vote among the co-trustees, which is how it was set up to operate. *Id.*

On cross-examination, Zachary indicated the Trust deals with repairs on an as needed basis and, if the repairs were to run beyond the $5,000.00 in the Trust account, the co-trustees would have to pay the difference. *Id.* at 51. He noted a majority of the co-trustees must give approval before any repair is made. *Id.*

Upon questioning by the court, Zachary indicated he and Ross are the only co-trustees who regularly visit and stay at the cabin. *Id.* at 58. He noted some of the other co-trustees have visited in recent years, but they don't stay overnight at the cabin. *Id.*

Larry, who is the son of the Decedent, testified he is not a named beneficiary of the Trust. *Id.* at 59. He has visited the Property approximately eight times in his life. *Id.* He would be willing to serve as the trustee without any financial compensation, and, in his opinion, he has no adverse relationship with any of the co-trustees/beneficiaries. *Id.* at 60. If named the trustee, he would conduct meetings with the beneficiaries via Zoom. *Id.* at 62. He indicated that, from his understanding, the Decedent gifted the Property to her grandchildren for them to enjoy. *Id.* at 60. "They are to keep it maintained and pass it on to the next generation…[s]o that it would remain in the family to be enjoyed by them[.]" *Id.*

He noted the cabin "started out as [his] dad's hunting camp,…and over the years it progressed and grew into a proper building." *Id.* at 60-61. He indicated that during summers his parents would take the grandchildren to the cabin, and they would spend a couple of weeks maintaining it, visiting the sites in the area, and enjoying the carnivals. *Id.* Larry testified that, during the Decedent's lifetime, there were no oil and gas leases on the Property. *Id.* at 62.

On cross-examination, Larry testified the last time he visited the Property was two or three years ago with his adult son, who is not a beneficiary of the Trust. *Id.* at 63. When asked whether Larry is aware that his brother, Wayne, does not want Larry to be the trustee, Larry responded he "was never told that, but it doesn't surprise [him]." *Id.* at 65. He reiterated

that he would be willing to serve as the trustee, but if he isn't allowed to do so, that is fine with him, as well. *Id.*

Wayne, who was the sole trustee of the Property until 2005, testified that, as it relates to future repairs, the plan is for the co-trustees to vote whether it is appropriate to appoint Mr. Christ "as a maintenance man to make monthly inspections of the [P]roperty, and to keep [the beneficiaries] updated on it. The [P]roperty is vacant eleven and a half months a year." *Id.* at 76. Wayne noted there are monthly bills, for which the co-trustees budget, and pursuant to the Orphans' Court's orders, the Trust account maintains a minimum balance of $5,000.00 for repairs and maintenance. *Id* at 77.

Regarding the oil and gas leases on the Property, Wayne indicated he was one of the signatories of the leases on behalf of the majority of the co-trustees. *Id.* at 78. Royalty checks from the leases are made payable to "The Estate of Eleanor M. Bullock." *Id.* He noted he makes copies of the royalty checks, and they are available for any beneficiary to view. *Id.* at 79. The Trust distributes income monthly to beneficiaries, in part, because it is easier for bookkeeping purposes. *Id.* at 88.

He indicated he is the primary bookkeeper for the Trust, but his wife assists him since he has developed difficulty with writing. *Id.* at 80. He testified he has asked the other co-trustees to take over the bookkeeping duties for the Trust; however, they have requested Wayne, who is their uncle, continue to do so. *Id.* He testified he would have passed over the

bookkeeping duties to Ross if he wanted the duties; however, Ross never asked. *Id* at 81. He admitted he never personally asked Ross if he wanted the bookkeeping duties since Ross demands that all communication occur through an attorney. *Id.* He noted that, since 1998, he has "spent thousands of hours on Trust things." *Id.*

Wayne acknowledged that Ross is dissatisfied with the repairs, which have been made to the cabin. *Id.* He acknowledged Ross would have made the repairs in a different manner, including as it relates to the joists under the porch. *Id.* at 85. However, Wayne indicated he and the remaining co-trustees are satisfied with the quality of the repairs. *Id.* Wayne testified Mr. Christ was "highly recommended" to him, and he is glad the Trust found him to do the work for the Property. *Id.* at 82. He indicated that any beneficiary/co-trustee is "welcome" to provide other estimates for repairs, and it's "always been [that] way." *Id.* at 83. He acknowledged Ross is dissatisfied with the idea of the Trust hiring Mr. Christ to manage the Property; however, in Wayne's opinion "[Ross] will never be happy." *Id.* at 91.

Wayne testified that, in his opinion, the yearly email exchange has been working satisfactorily for required yearly meetings among the co-trustees. *Id.* at 83. Aside from Ross, no one has complained. *Id.* He noted that in-person discussions would be difficult with Ross since the co-trustees can only communicate with him through an attorney. *Id.*

Wayne indicated he used to get along with Ross "just fine," but Ross "has taken a different route in his life which is unfortunate, and [Ross] has chose[n] not to talk to [the co-trustees], it was his choice." *Id.* at 88. Wayne testified Ross was the last beneficiary to be named as a co-trustee and, prior to this, there was no problem with the administration of the Trust. *Id.* at 91. He noted that, prior to Ross becoming a co-trustee, Ross got along with everyone; however, now "Ross wants to rule." *Id.* He noted that Ross is seeking to have Larry appointed as the trustee because Ross and Larry have "the same mindset." *Id.* at 92. Wayne testified he is not in favor of a third-party trustee since, per the express language of the Trust, it was not the Decedent's wish. *Id.* at 90.

Nicholas Granja testified that he has visited the Property many times during the past twelve years as Ross's guest, and the cabin has deteriorated. *Id.* at 95. Mr. Granja is a licensed contractor, and in his opinion, the repairs to the cabin's porch were not done correctly. *Id.* at 97. Also, he noted the new porch railing "doesn't meet uniform building code[s]" in that there are openings greater than four inches and the posts are not mounted with mechanical fasteners. *Id.* He noted the upper balcony needs to be repaired so that it doesn't collapse. *Id.* at 99.

On cross-examination, Mr. Granja agreed that he wasn't sure what the code requirements are for a building classified as a "cabin." *Id.* at 101. He indicated he assisted Ross in replacing a portion of the cabin's roof, and he

has "no idea" whether Ross secured a building permit for the work. *Id.* Mr. Granja admitted the added railing is better than having no railing; however, he reiterated the railing does not comply with building code regulations. *Id.* at 102.

Mr. Granja testified that the cabin is "dated" and "rustic." *Id.* at 103. He noted the right side of the existing cabin used to be a chicken coop, but Ross's grandfather added a kitchen to it and then later built a two-story addition with a porch. *Id.*

Mr. Christ testified he lives in the town where the Property is located. *Id.* at 104. He testified he has been working in construction since 1982, and he is registered with the Pennsylvania Builders' Association. *Id.* at 105. Mr. Christ confirmed he submitted to the co-trustees an estimate to perform repairs to the cabin. *Id.* at 106. He explained that he attached sister joists to the existing porch boards so that the entire porch did not need to be replaced. *Id.* He noted "sistering" involves attaching a new board to a rotting board in order to extend the life of a structure. *Id.* Mr. Christ opined that the cabin is "safe to standards of building." *Id.* at 108. He specifically opined the porch is safe for its intended purpose. *Id.* He noted he added a railing to the porch to help prevent people from falling off the porch in the dark. *Id.*

Mr. Christ confirmed he replaced flooring in the "chicken coop" portion of the cabin, replaced the shower, and mowed the Property. *Id.* at 109. He also assisted in repairing the septic at the rental house during the Fourth of

July weekend. *Id.* at 110. Mr. Christ testified he would be willing to check the Property periodically and perform maintenance on it. *Id.* at 112.

On cross-examination, Mr. Christ confirmed he spoke to Zachary about completing the porch repairs. *Id.* He indicated he has never spoken to Ross. *Id.* Rather, he discusses possible repairs with Zachary with the aim of making the structure "safe," and from his understanding, Zachary then discusses the possible repairs with the co-trustees. *Id.* at 113-17. Mr. Christ opined that, given the rustic nature of the cabin, it would be "very expensive" to bring everything "up to code." *Id.* at 115.

Samuel testified he is a co-trustee, and he found Mr. Christ's repairs to the cabin to be satisfactory. N.T., 1/19/23, at 3-4. He indicated Mr. Christ made "general improvements that were in keeping with the budget, the quality, and the character of the cabin" as agreed to among a majority of the co-trustees. *Id.* at 4-5. He noted he visited the cabin with his grandparents when he was a teenager, and his grandparents would ask him to complete different types of repairs in keeping with the character of the cabin. *Id.* Samuel testified the cabin began as a chicken coop, which his grandfather then turned into a hunting cabin. *Id.* at 6. His grandparents later added on to the chicken coop, and the existing co-trustees made repairs and improvements thereto. *Id.* at 7-8.

Samuel testified he became a co-trustee in 2005, and prior to the Trust signing oil and gas leases, the co-trustees carried the costs of maintenance,

insurance, and taxes on the Property with no expectation of income. *Id.* at 10. He noted that, when the Trust was originally approached by oil and gas companies to lease the Property, the co-trustees refused to lease the Property. *Id.* However, when it became clear the neighbors were going to lease their properties, and the oil and gas companies would remove the resources horizontally from beneath the Property without any compensation to the Trust, the co-trustees, who at the time were solely Wayne and Samuel, entered into oil and gas leases for the Property. *Id.*

On cross-examination, Samuel testified the budget of the Trust is generally what the co-trustees are "willing and able to spend." *Id.* at 14. He indicated that each co-trustee uses his own personal money to make repairs, pay the insurance, and pay the taxes on the Property. *Id.* He clarified that, if a bill or repair is needed beyond the amount kept in the Trust account, Wayne circulates the bill, and the co-trustees pay an equal share to make up the difference. *Id.* at 14-15.

He noted that, prior to the Trust signing the gas and oil leases, he and Wayne, the only co-trustees at the time, paid for all expenses for the Property from their personal accounts. *Id.* at 15. He indicated the Trust signed the oil and gas leases seven years ago, and even since that time, he has put personal funds into the Trust account for maintenance and repairs. *Id.*

Samuel indicated he has no concerns over the taxes of the Trust, and the co-trustees meet annually via email. *Id.* at 17-18. He acknowledged

Ross asked for the meetings to be "live," but a majority of the co-trustees voted against the request. *Id.* at 18. He noted Ross has asked for many repairs to the cabin; however, since Ross is "suing [the co-trustees they've] had a very hard time making the necessary arrangements to make any repairs or changes that need to be made." *Id.* at 19. He indicated the Trust operates upon a vote by a "majority of the Trustees." *Id.* at 20.

Samuel testified the co-trustees "are all interested in keeping the cabin at or above the standard that [their] grandfather set and maintained for the cabin." *Id.* at 21. He specifically denied he was more interested in receiving an economic benefit from the Property as opposed to maintaining the cabin as the Decedent and his grandfather would have wanted. *Id.* He noted the "guidelines" for maintenance are engraved "in the hearts" of the co-trustees and passed down from their grandfather. *Id.*

On redirect-examination, Samuel indicated the house rental income from the Property is not distributed to the co-trustees but is deposited into the Trust account. *Id.* at 23. Samuel noted that some repairs have been "placed on the back burner" because the co-trustees have been "consumed" with preparing for the "legal fight" initiated by Ross. *Id.* at 24. Samuel specifically denied Respondents have breached any fiduciary duties to the Trust. *Id.* at 25.

Lloyd testified he concurs with the testimony of Samuel, who is his brother. *Id.* at 28. He indicated he became a co-trustee in 2007, and he has

received distributions from the oil and gas leases. *Id.* at 29. He testified that to his knowledge all necessary repairs have been made to the Property, and he has reimbursed Ross for repairs that Ross made to the cabin. *Id.* at 30. He denied that any of Ross's demands for repayment had been ignored by the Trust. *Id.* He noted it is his understanding that any co-trustee can examine the Trust's financial records at any time, but he hasn't felt the need to do so. *Id.* at 32.

Lloyd indicated he would have been "fine" with in-person annual meetings; however, since a majority of co-trustees voted to conduct email meetings, he was "fine" with that, as well. *Id.* at 33. He indicated the issue wasn't that important to him, so he voted with the majority. *Id.* at 42. He testified the Trust operates by a majority vote. *Id.* at 36. He noted his vote has never been "courted" by the others. *Id.*

Lloyd indicated his grandfather had several unwritten customs, and the co-trustees have generally followed the customs, although Ross has not always agreed with the majority. *Id.* at 34-35. For example, his grandfather always gave the renter of the Property's rental home one free month of rent, and the majority of the co-trustees, excluding Ross, voted to continue this custom. *Id.* Ross indicated the Trust shouldn't take such action until "litigation is over." *Id.* at 35.

On cross-examination, Lloyd admitted he has not used the Property often over the last twenty years for "enjoyment," but he "can't speak to what

will happen in the next twenty." *Id.* at 37. He noted he hasn't spoken to Ross lately because he has been instructed to do so only through Ross's attorney. *Id.* at 39. Regarding votes on repairs, he noted he is not a builder, so when it is time to vote on whether a repair is needed to the cabin, he relies on the expertise of his brother, Samuel, who is a well-experienced builder. *Id.* at 41. He noted he receives monthly bank statements from the Trust account. *Id.* at 44.

At the conclusion of all testimony, Ross's attorney informed the Orphans' Court that Ross was seeking to have a disinterested third party named as a sole Trustee with all existing co-trustees removed from the Trust. *Id.* at 48. Ross's attorney suggested the court appoint either a relative, who is not a named beneficiary, or a corporate trustee, who would charge a fee. *Id.* at 47.

Respondents' attorney, on the other hand, suggested the only co-trustee who should be removed is Ross. *Id.* at 50. Respondents' attorney noted Ross volunteered to remove himself via his own petition. *Id.* Respondents' attorney noted Ross should remain as a beneficiary to enjoy the Property as intended by the Trust; however, he should be removed as a co-trustee because he engages in excessive litigation and refuses to cooperate with the other co-trustees in any manner. *Id.*

Thereafter, by order entered on January 27, 2023, the Orphans' Court directed that Ross be removed as co-trustee of the Trust pursuant to 20

Pa.C.S.A. § 7766(b)(2). Specifically, the Orphans' Court indicated that Ross's "lack of cooperation" with the other co-trustees "substantially impairs the administration of the Trust." Orphans' Court's Order, filed 1/27/23. The Orphans' Court noted that Ross remained as a beneficiary of the Trust. The remaining co-trustees remained intact. On February 28, 2023, Ross filed a notice of appeal from the Orphans' Court's final order,[4] and all Pa.R.A.P. 1925 requirements have been met.

On appeal, Ross sets forth the following issues in his "Statement of Questions Involved" (verbatim):

> 1. Did the lower court err as a matter of law and/or otherwise abuse its discretion in removing [Ross] as Trustee?
>
> 2. Did the lower court err as a matter of law and/or otherwise abuse its discretion in not removing [Respondents] as co-trustees?

_____

[4] We note the Orphans' Court filed its order on January 27, 2023, and Ross filed his notice of appeal thirty-two days thereafter, on February 28, 2023. Generally, an appeal must be filed within thirty days after the entry of the order appealed from, and an untimely appeal may be quashed by this Court. **See** Pa.R.A.P. 903(a). However, our Supreme Court has held that the thirty-day appeal period does not begin to run until the prothonotary enters the order on the docket with the required notation that it gave appropriate notice to counsel and unrepresented parties. **See** *Frazier v. City of Philadelphia*, 735 A.2d 113 (Pa. 1999). **See also** Pa.R.O.C.P. 4.6 (requiring the clerk of orphans' court to immediately give written notice of entry of order and note in docket date notice given). This holding in *Frazier* is a "bright-line rule to be interpreted strictly." *In re L.M.*, 923 A.2d 505, 509 (Pa.Super. 2007). In the case *sub judice*, there was no corresponding entry on the docket, and, thus, formal entry of the order did not occur under the rules. Accordingly, we shall proceed to examine the merits of Ross's appeal.

Ross's Brief at 4 (suggested answers omitted).

Ross's issues are intertwined. Ross contends there is insufficient evidence to sustain the Orphans' Court's removal of him solely as a trustee under 20 Pa.C.S.A. § 7766(b). Rather, he suggests the evidence reveals the Orphans' Court should have removed all co-trustees while providing for the appointment of a disinterested third-party trustee.

In this vein, Ross contends the evidence is insufficient to demonstrate that removal of him solely as a co-trustee is in the best interests of the Trust's beneficiaries and is not inconsistent with the Trust's material purpose of preserving the Property for wholesome, recreational enjoyment. He contends he proved a suitable third-party trustee is available.

He further posits the Orphans' Court erroneously dismissed him solely as a co-trustee based on Subsection 7766(b)(2). He suggests the evidence is insufficient to demonstrate that he alone is responsible for the lack of cooperation among the co-trustees, which substantially impairs the administration of the trust.

"When reviewing [an order] entered by the orphans' court, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence." **In re Cohen**, 188 A.3d 1208, 1210 (Pa.Super. 2018) (citation and brackets omitted).

> The findings of a judge of the orphans' court division, sitting without a jury, must be accorded the same weight and effect as the verdict of a jury, and will not be reversed by an appellate court in the absence of an abuse of discretion or a lack of evidentiary

support. This rule is particularly applicable to findings of fact which are predicated upon the credibility of the witnesses, whom the judge has had the opportunity to hear and observe, and upon the weight given to their testimony.

*In re Jackson*, 174 A.3d 14, 23 (Pa.Super. 2017) (citation omitted). The Orphans' Court's decision to appoint or remove a trustee is subject to review for abuse of discretion. *In re Croessant's Estate*, 393 A.2d 443, 446 (Pa. 1978).

20 Pa.C.S.A. § 7766(b) relevantly provides as follows:

**(b) When court may remove trustee.--**The court may remove a trustee if it finds that removal of the trustee best serves the interests of the beneficiaries of the trust and is not inconsistent with a material purpose of the trust, a suitable co-trustee or successor trustee is available and:

(1) the trustee has committed a serious breach of trust;

(2) lack of cooperation among co-trustees substantially impairs the administration of the trust;

(3) the trustee has not effectively administered the trust because of the trustee's unfitness, unwillingness or persistent failures; or

(4) there has been a substantial change of circumstances. A corporate reorganization of an institutional trustee, including a plan of merger or consolidation, is not itself a substantial change of circumstances.

20 Pa.C.S.A. § 7766(b) (bold in original). "The JSGC comments to section 7766 provide that its 'grounds for removal assume an active inquiry and findings by the court.' 20 Pa.C.S. § 7766, JSGC Comment—2005." *Trust Under Agreement of Taylor*, 164 A.3d 1147, 1158 (Pa. 2017).

Here, the Orphans' Court found grounds for removal of solely Ross under Subsection 7766(b)(2).

> [A] person seeking trustee removal pursuant to Section [7766(b)(2)] must show by clear and convincing evidence that: the removal serves the beneficiaries' best interests; the removal is not inconsistent with a material purpose of the trust; a suitable successor trustee is available; and [a lack of cooperation among co-trustees substantially impairs the administration of the trust]. If all of the requirements are met, then the trial court, in its discretion, "may remove" the trustee through an exercise of its discretion. 20 Pa.C.S.A. § 7766(b).

*In re McKinney*, 67 A.3d 824, 830 (Pa.Super. 2013) (citation omitted).

Moreover, regarding removal of a trustee under Subsection 7766(b)(2), our Supreme Court has held:

> Pennsylvania has a long history of strictly limiting the removal and replacement of a trustee to circumstances in which an Orphans' Court determines that good cause exists to do so....A testator has, as a property right, the privilege and power to place the management of [her] estate in a selected person as a condition of [her] bounty. While inharmonious relations between trustee and [beneficiaries/co-trustees], not altogether the fault of the former, will not generally be considered a sufficient cause for removal, yet where they have reached so acrimonious a condition as to make any personal intercourse impossible, and to hinder the proper transaction of business between the parties, a due regard for the interests of the estate and the rights of the [beneficiaries/co-trustees] may require a change of trustee.

*Trust Under Agreement of Taylor*, 164 A.3d at 1158-59 (citations omitted).

Here, the Orphans' Court provided the following analysis for removing Ross as a co-trustee while retaining the remaining co-trustees:

> Pursuant to 20 Pa.C.S.A. § 7766(b)(2), the [Orphans'] Court may remove a trustee when the lack of cooperation among the [co-trustees] impacts the administration of the Trust. That is exactly what has occurred in this case. *Trust under agreement of Taylor*, [*supra*]. The disagreements between the parties, and all the resulting litigation, has clearly interfered with the proper administration of the Trust, such that the removal of [Ross] as a co-trustee is warranted and, in fact, necessary. The history of this

matter has led to a breakdown of communication, as well as substantial litigation between the [co-trustees] relating to simple repairs of the cabin on the premises. Caselaw supports this conclusion in that hostility among [co-trustees], or between a trustee and a beneficiary, may be so severe as to justify relief including removal, so that that the proper administration of the Trust is not jeopardized. *In re Croessant's Estate*, [*supra*].

While removal is a drastic remedy, this situation involves not only a lapse in communication, but also [co-trustees not wanting] to deal at all with [Ross]. *In re White*, 484 A.2d 763 (Pa. 1984). Looking at all of the evidence presented, the standard of clear and convincing evidence to justify the removal of [Ross] has been met, if not exceeded. *In re McKinney*, [*supra*]. As noted in [*In re McKinney*,] the best interests of all the beneficiaries, including [Ross] himself, are best met by his removal as a [co-trustee]. [*See id.*] [Ross], of course, remains a beneficiary, and [he] retains the right to utilize the Property as he has in the past. These rights will not be affected in any way by his removal.

As our Court's have noted, "…the polestar of every Trust…is the settlor's…intent and that must prevail…" *In re McKinney*, 67 A.3d at 830 (citing *In re Estate of Warden*, 2 A.3d 565 (Pa.Super. 2010)). [The Decedent] envisioned a situation where certain of her heirs could freely use this Property for recreational purposes. The dissention caused by [Ross] has jeopardized that goal since the beneficiaries cannot agree or communicate with him and have acrimonious feelings towards him. Given the circumstances, the whole concept envisioned by the Trust is jeopardized. With the ill feeling arising from [Ross's] demands, it is inconceivable that many of the majority of the [co-trustees] would be comfortable using the Property where they might encounter [Ross] or have to deal with him on a repair or maintenance issue. Most communications between the majority [co-trustees] and [Ross] are currently through attorneys.

[Ross] did suggest several alternatives to the relief given by the [Orphans'] Court. He suggested adding Larry Bullock as a disinterested trustee. Based on the testimony, however, it appears that [Larry] is perceived as somewhat aligned with [Ross], and [he] does not have the confidence of the other [co-trustees]. This alternative seems unworkable, as does his suggestion of using a financial institution given the limited resources of the Trust. In the end analysis, [Ross] has caused

substantial problems with his unreasonable demands, and he has alienated all of his fellow [co-trustees]. This cannot continue.

Orphans' Court's Opinion, filed 3/28/23, at 2-3.

We find no abuse of discretion, and the Orphans' Court's findings are supported by the record. *See In re Cohen*, *supra*. We agree with the Orphan's Court that Respondents demonstrated, by clear and convincing evidence, that the disputes and difficulties in administering the Trust arose after Ross became a co-trustee. *See* Orphans' Court's Opinion, filed 3/28/23, at 2 ¶ 23. Thereafter, "irreconcilable differences" arose with Ross in opposition to the remaining co-trustees on nearly every issue related to the administration of the Trust, including the repairs to the cabin, the hiring of a property manager, and the distribution of income generated by the Property. *See id.* at 2 ¶ 21.

While "inharmonious relations" between Ross and the remaining co-trustees alone would not "generally be considered a sufficient cause for removal," the relations have become so "acrimonious" that Ross demands the remaining co-trustees, who are his family members, communicate with him only through his legal counsel. *Trust Under Agreement of Taylor*, 164 A.3d at 1158-59. Testimony established the acrimonious relationship hinders the proper administration of the Trust, including making repairs in a timely manner, and, as the Orphans' Court held, prevents all co-trustees from enjoying the Property, which was the primary intent of the Decedent in establishing the Trust.

Further, the Orphans' Court properly concluded that, as opposed to removing all co-trustees, it was in the best interest of the beneficiaries, and furthered the material purpose of the Trust, for Respondents (the remaining co-trustees) to remain intact. As the Orphans' Court noted, the financial strain of having a third-party financial institution or attorney to administer the Trust is unwarranted. Further, the Decedent intended for the Trust to be administered primarily by the beneficiaries, who were her son and grandsons, as they each turned thirty years old. There is no evidence the relationship among Respondents is acrimonious or would hinder the administration of the Trust. Thus, we find no abuse of discretion in this regard. *In re Croessant's Estate*, *supra*.

For all of the foregoing reasons, we affirm.

Affirmed.

Judgment Entered.

_____

Benjamin D. Kohler, Esq.
Prothonotary

Date: 11/28/2023